**MENOMINEE TRIBE OF INDIANS v. UNITED STATES.**

No. 44304.

United States Court of Claims.

July 10, 1950.

green timber as the forestry service shall designate, upon the Menominee Indian Reservation in the State of Wisconsin: *Provided,* That not more than twenty million feet of timber shall be cut in any one year. * * * "

Section 2 of the act, which is not in issue herein, made provision for the building of saw mills, for the manufacture into lumber of the timber cut under the provisions of the act, for the employment of Indians and certain skilled workers, and for the letting of contracts for logging. Section 3 provided for the manner in which the lumber should be sold and for the disposition of the proceeds. Section 4 provided for the use of tribal funds for the necessary expenses of the lumber operations, and for the protection and preservation of the forest on the reservation. Section 5 provided that when the dead and down timber and such fully matured and ripened green timber as the Forestry Service should designate had been converted into lumber, the Secretary of the Interior should sell those portions of the saw mills and manufacturing plant as would not, in his judgment, be needed for continuing operations on the reservation.

Pursuant to the act of September 3, 1935, c. 839, 49 Stat. 1085, as amended by the act of April 8, 1938, c. 120, 52 Stat. 208, Congress conferred jurisdiction on the Court of Claims as follows: "That jurisdiction is hereby conferred on the Court of Claims to hear, determine, adjudicate, and render final judgment on all legal or equitable claims of whatsoever nature which the Menominee Tribe of Indians may have against the United States, arising under or growing out of any treaties, agreements, or laws of Congress, or out of any maladministration or wrongful handling of any of the funds, land, timber or other property or business enterprises belonging to said tribe or held in trust for it by the United States, or otherwise; including, but without limiting the generality of the foregoing, * * *; (3) claims for damages allegedly caused by the United States cutting timber on the Menominee Reservation contrary to the terms and provisions of the aforesaid Act of March 28, 1908 (35 Stat.L. 51); * * *."

* * * * * *

Kenneth C. Royall and Ernest L. Wilkinson, Washington, D. C., for the plaintiff. Richard E. Dwight, Andrew E. Stewart, and Dwight, Royall, Harris, Koegel & Caskey, all of Washington, D.C. on the brief.

David D. Hochstein, Washington, D. C., with whom was Assistant Attorney General A. Devitt Vanech, for the defendant. J. P. Kinney, Washington, D. C., on the brief.

Before JONES, Chief Judge and MADDEN, WHITAKER, LITTLETON and HOWELL, JJ.

HOWELL, Judge.

Plaintiff sues to recover damages for the failure of defendant to comply with those provisions of the Act of March 28, 1908, 35 Stat. 51, governing the cutting of timber on the Menominee Indian Reservation. The act is entitled "An Act To authorize the cutting of timber, the manufacture and sale of lumber, and the preservation of the forests on the Menominee Indian Reservation in the State of Wisconsin," and contains the following pertinent provision: "That the Secretary of the Interior be, and he is hereby, authorized and directed, under such rules and regulations as he may prescribe in executing the intent and purposes of this Act, to cause to be cut and manufactured into lumber the dead and down timber, and such fully matured and ripened

Section 6 of the Act provides in part: "(c) If it shall be determined by the court that the United States has violated the terms and provisions of the Act of Congress of March 28, 1908 (35 Stat.L. 51), by cutting other than dead and down timber or such fully matured and ripened timber as the Forestry Service shall have properly designated, or by cutting such timber so as to prevent forest perpetuation, the court shall award as damages to the Menominee Tribe of Indians * * *."

Section 3 of the Act provides in part: "At the trial of any suit instituted hereunder the court shall apply as respects the United States the same principles of law as would be applied to an ordinary fiduciary and shall settle and determine the rights thereon both legal and equitable of said Menominee Tribe against the United States notwithstanding lapse of time or statute of limitations."

The plaintiff contends that from 1910 to 1928, inclusive, defendant violated the provisions of the first section of the 1908 act by cutting other than fully matured and ripened green timber and by cutting green timber which had not been designated by the Forestry Service, and that timber in certain areas was cut in such a manner that the forest on those areas was not preserved in compliance with the purpose of the act. The only question now before the court is the legal and equitable right of plaintiff, under provisions of the jurisdictional act and the evidence in this case, to recover for damages allegedly caused by the defendant, the amount of the recovery and the amount of offsets, if any, being reserved for further proceedings under rule 39(a), Rules of Court of Claims, 28 U.S. C.A.

We shall first describe briefly the facts which are set forth in full in our findings. We shall also allude in a limited manner to portions of the legislative history of the 1908 Act. The Menominee Indian Reservation was acquired by the plaintiff tribe in 1854 and is located in the northern part of Wisconsin. It contained some 230,000 acres, largely covered with heavy stands of timber consisting primarily of white and Norway pine, hardwoods and hemlock.

From 1854 to 1871, small amounts of timber were cut by the Indians for their own use. Beginning in 1871, the Secretary of the Interior consented to the cutting of timber for sale in log form to saw mills located outside the reservation. Between 1870 and 1890, more than 88 million board feet of timber were cut and sold in addition to the timber cut for the use of the Indians. In 1890, the act of June 12, 26 Stat. 146, authorized the cutting from the reservation of 20 million board feet annually, and during the following years up to 1908 approximately 295 million board feet of timber were cut. During this period, certain portions of the reservation were destroyed by forest fires and in July of 1905 a severe wind storm blew down or severely damaged approximately 40 million board feet of timber on the reservation. The Act of June 28, 1906, 34 Stat. 547, authorized the logging and sawing of blown-down timber and the sale of the lumber products. Partly because the 1906 act did not fully accomplish the desired purpose, and partly because there was a growing concern over the depletion of this country's timber resources by the type of cutting employed in our forests generally and on this reservation in particular, Congress passed the Act of March 28, 1908, supra. The practice followed by most lumber companies throughout the country prior to this time was to log one area thoroughly of all merchantable timber, abandon the cut-over area, buy new timber rights, and so pass on from one section to another, the logging being done from a strictly commercial standpoint and without regard to forest conservation. However, even before 1908, it was recognized that our forest resources were not, as had been thought, inexhaustible, and with the advent of Theodore Roosevelt as President, a strong movement in favor of conservation of this country's natural resources came into existence. Gifford Pinchot, a well-known conservationist, strengthened and expanded the Forest Service of the Department of Agriculture and the national forests were placed under the jurisdiction of that Forest Service in 1905 to be cut and managed in accordance with forest conservation principles. On February 11, 1907,

Senator La Follette of Wisconsin introduced S. 8431 providing not only for the limitation of the yearly cut on the Menominee reservation to 20 million feet but also that "only such standing and growing timber shall be cut as shall be marked for cutting under the direction of the forestry service." On February 14, 1907, this bill was favorably reported for the Senate Indian Affairs Committee (S.Rep. 6669, 59th Congress, 2d Session) and the report revealed the intention of the bill to prevent white lumbermen of the region from exploiting the lumber on the reservation in their usual destructive manner. The report in part stated:

"The timber growing upon the Menominee Indian Reservation in Wisconsin is altogether the finest body of natural timber left standing in the State. With the rapid disappearance of our forests its value constantly increases. It is, therefore, not at all strange that lumbermen and mill men should be eager to secure this timber and should press for legislation providing for its sale. The timber is the property of the Indians. Their property rights and their personal welfare are the matters for consideration.

\* \* \* \* \* \*

"If properly protected and conserved, if only fully matured trees selected by a competent forester are cut each season, if the tops and slashings are carefully burned and all dead and down timber logged and marketed each year, devastating fires can be kept off the reservation and this splendid forest perpetuated. Such a course will afford a healthful and profitable occupation to the Indians and insure their receiving the full value of this rich heritage."

The bill passed the Senate on February 27, 1907, but on March 3, 1907, it was brought to the attention of the Senate that there was a House bill embracing the same subject matter, whereupon the Senate amended the House bill to conform it to the Senate bill and gave it its approval (41 Cong.Rec., part 4, p. 4559). On the same day the House asked for a conference upon the amendment but on the next day, before the conference had been had, the 59th Congress adjourned. At the next session of Congress in January 1908, Senator La Follette introduced a similar bill, S. 4046, which expanded the previous bill to regulate in more detail the timber and lumber operations to be conducted on the reservation, but narrowed the coverage of the bill to confine its application to the Menominee reservation rather than all reservations in the State of Wisconsin. This bill was passed by Congress and became the Act of March 28, 1908.

With respect to the role of the Forestry Service of the Department of Agriculture in the bill as finally passed, Section 1 provided, as set forth above, that there should be cut such fully matured and ripened green timber "as the forestry service shall designate." In a hearing before the Committee on Indian Affairs, House of Representatives, on February 20, 1908, Congressman Stephens commented as follows: "Mr. Stephens. I notice in the bill that the Forestry Service has the right to designate what timber is ripened and green, in these words, on page 1, lines 7 and 8, as follows: "and such fully matured and ripened green timber as the Forestry Service shall designate." That seems to make it the duty of the Forestry Service to go through these forests and mark each tree that shall be cut."

Mr. George A. Ward of the Indian Office at the same hearing made the following statement: "Mr. Ward. It is the intention to cut such timber as may be marked—that will be the dead timber, standing or fallen, and the ripened timber. The small timber of course will not be cut."

Congressman Morse, who sponsored and reported the House bill, made the following statement: "The idea of this bill—or the Senator's idea of this bill—is to make a continuing forestry reserve so as to put it under the Forestry Service entirely. If I am not mistaken there is a contract drawn up between the Indian Department and the Forestry Service whereby the Forestry Service takes charge of this hereafter."

The report of the House Committee on Indian Affairs accompanying the bill (H.

Rep.No. 1086, 60th Congress, 1st Session, February 26, 1908) reads in part as follows:

"The cutting of all the timber on the reservation will be done under the supervision of the Forestry Service, and it is believed with such supervision the supply of timber will be made continuous and that the Indians, so long as they retain the reservation, will have not only an income from it, but will become independent so far as their own individual efforts are concerned."

Just prior to the enactment of the Act of March 28, 1908, the Department of the Interior and the Department of Agriculture entered into an agreement whereby the Forest Service of the Department of Agriculture undertook—

"1. The sale of timber and the supervision of logging on Indian Reservations, under methods which will improve the forest and yield the full market value of all timber cut.

"2. The protection of all forests on Indian Reservations, whether they are now being cut over or not.

"3. A study of the forests on Indian Reservations to determine the best permanent use of the lands upon which they grow; and where these are more valuable for forest purposes than for any other, the preparation and application of plans for their management."

In the agreement it was also provided:

"1. That the salaries and expenses of all men actually employed to carry out this cooperative agreement, and all necessary expenses for equipment and supplies, shall be borne by the Indian Office.

"2. That all men so employed and all those already employed in forest work on Indian Reservations, shall constitute a part of the force of the Forest Service, responsible directly and only thereto.

"3. That in the employment of Indian labor, in keeping liquor away from the Indians, and in other essential ways, the Forest Service will apply in its administration of forest matters the policies of the Indian Office for the welfare of the Indians; but that work in the woods under policies agreed upon by the Indian Office and the Forest Service, shall be planned, initiated, and conducted wholly by officers of the Forest Service."

Pursuant to this agreement the Forest Service placed E. A. Braniff, a forest assistant, in charge of all timber operations on the reservation on March 10, 1908. This arrangement continued following the enactment of the 1908 Act so that the operations under that act and the erection of the lumber mill provided for were under the supervision of the Forest Service. There was no cutting of green timber on the reservation for about a year and a half following the enactment of the 1908 act except for very small amounts and the Forest Service restricted its activities to erecting the mill and sawing into lumber dead and down timber from the blowndown area. On July 20, 1909, the Department of the Interior abandoned the agreement on the ground that the plan of cooperation was in violation of law, and Braniff was accordingly transferred from the Forest Service of the Department of Agriculture to the Department of the Interior. In August 1909, Braniff, as forester in charge of the Menominee operations wrote to the Commissioner of Indian Affairs, requesting that the Forest Service of the Department of Agriculture send trained markers to the reservation to mark the timber to be cut that fall and winter pursuant to the Act of March 28, 1908, remarking that the act "requires that the Forest Service shall designate the character of the timber that shall be cut." At the request of the Secretary of the Interior the Forest Service sent two foresters to the reservation in September 1909 with instructions to mark the timber. In the subsequent markings in the fall of 1909, each tree to be cut was blazed and stamped by the foresters as a guide for cutting. The areas so marked in Township 29, Ranges 14 and 13 East, were logged in a selectively cut manner, a system of cutting which will be discussed more fully hereinafter. Later examinations of these areas revealed that there had been substantial compliance with the requirements that only marked trees should be removed and that an adequate stand of trees should be left to provide the basis for sub-

sequent cuttings at proper intervals of time. Braniff left the employ of the Indian Office in October 1909. Subsequent to 1910, no further markings were done by the Forest Service in this area. Certain areas west of Neopit, at locations not involved in this suit, were marked by other foresters of the Forest Service in the fall of 1910 pursuant to the request of the Secretary of the Interior to the Secretary of Agriculture. These areas were cut in accordance with the markings and in those areas where selective cutting was done, the stands today are well stocked with valuable timber ready for a second cutting.

In the summer of 1910, a fire occurred in the Evergreen area and cutting operations were transferred to that region. While the fire did some damage, and a certain amount of burned timber was required to be cut as a salvage operation, the vast majority of timber cut in the Evergreen area during the period in suit was green timber which was either uninjured or only slightly injured by the fire. During the 1910–1911 logging season in the Evergreen area, no markings were requested to be made by the Department of Agriculture Forest Service, nor were any made in connection with the logging done.

In the logging season 1911–1912 in the Evergreen area, the Forest Service of the Department of Agriculture, instead of marking individual trees, designated the class of trees to be cut and specified certain diameter limitations, such as the cutting of all hemlock over 12 inches in diameter and all pine and hardwoods over 15 inches in diameter. In October 1912, Earl A. Frothingham, an agent of the Department of Agriculture Forest Service, led a party which marked trees in a test strip consisting of about 20 acres. These foresters had not been informed of the terms of the 1908 act with respect to the cutting of only "fully matured and ripened green timber," nor of the limitation of 20 million board feet which could be cut in one year. These men were informed that the Menominee Indian mills had a capacity for sawing approximately 40 million board feet of timber and were under the mistaken impression that they were required to mark sufficient timber to

supply at least 35 million feet to the mills. The area selected by the Indian Service for the cutting, consisted of 2,300 acres. After experimentally marking the trees on a portion of the test strip consisting of an area approximately 100 feet wide and one and a half miles long, the markers concluded that it would be necessary to clear-cut everything on the 2,300 acres in order to provide the 35 million board feet of timber, and accordingly they abandoned their attempts to mark individual trees. On November 22, 1912, the Forest Service sent to the Commissioner of Indian Affairs the following cutting instructions in lieu of individual tree marking:

"Old growth timber in all forest types, including the pure hemlock type, the mixed hemlock, hardwoods, and pine, and the swamps, should be designated for cutting as follows:

" 'All merchantable hemlock trees, except in selected groups, which should be left intact. These groups shall be of small trees, averaging 12 inches or less, in diameter at breastheight, and should be at least ⅛ of an acre in extent; in them no trees, irrespective of species should be cut.

" 'All merchantable hardwood trees, except short-bodied basswood, yellow birch, and rock elm, which contain one merchantable 16-foot log or less.

" 'All merchantable pine trees 15 inches and over in diameter at breastheight. Wherever necessary for protection against wind, and it appears feasible, small groups of trees should be left around the pines.

" 'All merchantable trees in swamps.' " The above cutting instructions will be hereinafter referred to as the 1912 Rules.

 It is undisputed that the word "green" used in connection with timber means live timber. The parties are in conflict with respect to the meaning of the expression "fully matured and ripened" as used in the 1908 Act. They agree that the word "mature" in connection with timber may mean either physiological maturity or commercial maturity. Physiologically, timber is mature when it has completed its maximum rate of growth and its annual rate of growth has become less than the

average preceding annual rate of growth. A tree does not become overmature until the rate of decay equals or exceeds net growth. Market or commercial maturity refers to timber that has attained a sufficient size to be cut profitably for some commercial purpose, and that size may fall far short of the size a tree must attain to reach physiological maturity. The size of the tree, as it is referred to herein, means its diameter measured at breast-height. The size at which a tree is com-mercially mature will depend upon the demands of the market from time to time. There is no fixed diameter size for any species of timber at which a tree may be said to have reached physiological maturity, because of the many and varying factors which contribute to the rate and the extent of growth. However, the following species which comprise the greater part of the timber on the reservation generally reach physiological maturity during the following range of diameter sizes and ages:

| Species | Diameter (inches) | | Age (years) | |
|---|---|---|---|---|
| | From— | To— | From— | To— |
| Maple ............... | 20 | 28 | 120 | 240 |
| Beech ............... | 16 | 22 | 90 | 180 |
| Yellow Birch ....... | 18 | 24 | 110 | 220 |
| Eastern Hemlock.... | 22 | 28 | 140 | 220 |
| White Pine ......... | 22 | 32 | 100 | 200 |
| Basswood ........... | 18 | 24 | 100 | 200 |
| Elm ................. | 22 | 30 | 140 | 300 |
| Oak, red and white.. | 20 | 28 | 120 | 240 |
| Red (Norway) Pine.. | 12 | 18 | 40 | 100 |

The Menominee forest was almost wholly uneven aged, that is, stocked with trees of many ages, although in some areas, physically, many had passed into the mature or overmature stage. In such a forest, even the logging of only physiologically fully matured green timber would not, without proper forestry supervision, assure the preservation of the forest, and if *all* such mature trees were cut, some areas might be practically denuded.

In many portions of the Menominee forest, the trees stood in close proximity, a condition which, from a lumber standpoint, was desirable since the proximity of other trees kills off the lower branches and produces trees free from knots which are formed in the bole or trunk at the outgrowth of such branches. However, this same condition of density resulted in the bruising or felling of the immature trees where all of the mature and overmature trees were logged, even when precautions in logging were taken. In addition, the removal of the protective canopy of all these older trees exposed the remaining young trees to such adverse conditions as to make survival difficult if not impossible. Thus, during the period in suit, logging under the 1912 rules, even if they had been followed, would have removed so much of the stand that few of the small trees could have been saved in the process.

The Menominee forest contained a large proportion of tolerant species which are particularly sensitive to the disturbances caused by heavy logging. A tolerant tree thrives best in the shade of other trees. Undue exposure to sunlight and subjection to drying-out conditions is harmful and sometimes destructive of this species. A knowledge of the peculiarities of the various species in a forest is necessary in order to plan a type of cutting which will do the least damage to the remaining forest and insure a future crop of valuable timber within a reasonable time. Between 1912 and 1918, cutting on the Menominee forest was not done under the supervision of a trained forester. The 1912 rules, inadequate as they were in this type of forest for the preservation of the forest, were not followed, and area after area was logged of all merchantable timber, leaving such areas with little chance of growing into a new forest and, because of the 20 million annual limit on cutting, deferring the necessary cutting-off of overmature timber in areas not reached. Such overmature timber was decreasing in value each year it was left standing and as decay set in, such timber became increasingly subject to blow-down

from high winds. The areas cut of all merchantable timber were exposed to drying-out conditions and constituted a perpetual fire hazard. The small trees which survived the cutting were at the mercy not only of fire but also of high winds.

In 1917 and 1918, two nearly identical acts were passed [1] relative to farming activities on the reservation. These acts provided that agriculture might be carried on on certain cut-over lands where there was some merchantable timber growing. It required the Indian Bureau to survey the cut-over land which was to be cleared of merchantable timber for farming purposes. It also required the Forest Service of the Indian Bureau to certify that the cut-over lands proposed to be so cleared were not necessary to the preservation of the forest and that it would not be detrimental to the forest that the merchantable timber be removed. After the passage of the 1917 Act and up to May 1918, the Commissioner of Indian Affairs continued the practice of requesting designations of the trees to be cut from the Forest Service of the Department of Agriculture. The Commissioner of Indian Affairs apparently interpreted the Act of May 25, 1918, to mean that it would no longer be necessary to request the Department of Agriculture to designate the timber to be logged on the Menominee reservation, and from that time through the rest of the period in suit, no further requests were made to the Department of Agriculture for designations of the timber to be cut. Cutting in the evergreen area proceeded in much the same way subsequent to 1918 as it had prior to that time, except that the existence of a good pulp market beginning in 1920 impelled the Indian Bureau to cause to be cut trees of a size so small that prior to the demand for pulp they had not been considered merchantable.

In 1922, Mr. Grapp, a trained forester of the Indian Office, was stationed on the reservation but, because the local management was afraid that the practice of scientific forestry might interfere with the immediate commercial success of the yearly logging operations, Mr. Grapp was not allowed to survey the areas being cut nor take any part in the planning of future cuttings until sometime late in 1925.

In the South Branch District, lying within Township 30 North, Range 16 East, some logging of pine had taken place many years prior to 1908. This area had suffered in part from a burn and contained some swamp land. However, there were on the areas therein claimed by plaintiff and specifically set out in our findings, stands of hemlock mixed with hardwood which were cut by jobbers [2] during the period from 1920 to 1926. With the exception of approximately 80 acres in section 1 (finding No. 73), where most of the timber cut had been fire-killed, the area in question contained live trees of all ages which were cut without any designation by the Forest Service. The cutting took everything that was merchantable down to very small trees that could be used for pulp. No care was taken to preserve the small amount of young growth left after logging and there is little likelihood of a new forest on this area for a great many years, if ever.

In 1925, a fire occurred in an area around Moshawquit Lake and it was originally thought that a great deal of damage was done to the timber in that area. Subsequently it was determined that much less damage than was anticipated had resulted and the local management of the Indian Office on the reservation was instructed by the Commissioner of Indian Affairs to cut only such merchantable trees as were so damaged by fire that their immediate cutting was necessary to salvage their value.

1. Act of March 2, 1917, 39 Stat. 991; Act of May 25, 1918, 40 Stat. 561.

2. During most of the period in suit logging on the areas claimed was done from Government camps numbered serially and located throughout the area as indicated in our finding No. 30. In addition to the logging from these Government camps, contracts were given to individual logging contractors or jobbers to log timber in a given area at a certain price per thousand board feet, subject to supervision by the local Indian Office officials at the Menominee Indian mills.

In addition, the management was later directed to leave such seed trees as were designated by the Indian Office forester stationed on the reservation and to cease cutting where no fire damage had occurred. These latter instructions were necessary because the local management had begun clear cutting all of the timber, including the unburned timber. In spite of these instructions, the area was clear-cut, a large proportion of the timber cut being only slightly injured or uninjured and some was outside the fire area. Many of the green trees cut in this operation were not mature and the few trees left were inadequate to restock the area.

In our special findings of fact (Finding 4) we have set forth the location and size by acres of the areas on which plaintiff claims there was logging in violation of the 1908 Act. We have also in our findings described the nature of the logging on those areas and have found that in all but two instances (Findings 50 and 74), the logging of mature live timber was carried on without the marking of individual trees, that many immature live trees were cut, that both the 1911 and the 1912 rules of designation would, if followed, have resulted in the cutting of immature green timber, that in fact the 1911 and 1912 rules were not followed, that the resulting stand on these areas was not sufficient to preserve the forest and that the species now predominating on these areas, such as aspen and fire cherry, are of little value.

The Government argues that it is not liable to the plaintiff under either the Act of 1908 or the jurisdictional act and makes a number of contentions in support of this argument.

First, the Government contends that the primary purpose of the 1908 Act was to provide for the manufacture into lumber of the logs that had been cut in the blown-down district after the blow-down in 1905; that the secondary purpose of the act was to advance the Indians to economic independence through the industrial experience they would gain in connection with the logging and milling enterprise author-ized by the act; that the third purpose was the profitable marketing of a valuable natural resource; and that only incidental to those primary purposes was the protection of the Menominee forest. If the defendant is right in this contention, it seems somewhat strange that Congress should entitle the 1908 Act "An Act To authorize the cutting of timber, the manufacture and sale of lumber, and the preservation of the forests on the Menominee Indian Reservation in the State of Wisconsin," and then in the first section, limit the amount of green timber to be cut and provide for the designation of such timber by the Forest Service of the Department of Agriculture. From this it appears to us that the preservation of the forest, if not the primary purpose of the act, was at least considered by Congress to be equal in importance with the other purposes mentioned in the title and provided for in sections 2, 3, 4, and 5. We find no merit to defendant's contention, and the legislative history of the 1908 Act set forth in part above relieves the matter of all possible doubt.

Next the defendant states that, assuming the 1908 Act did require the preservation of the forest, the Government's management of the forest during the period in suit, in general accomplished that purpose.

There were various methods of logging in general use in 1908 and prior to that time. Certain methods were developed for the express purpose of raising lumber as a crop. These methods include the shelter-wood system whereby enough trees are left to protect immature trees against exposed conditions, the strip method whereby cutting was restricted to lanes narrow enough to be seeded and protected from the sides, the seed-tree method whereby certain trees were left for seeding the surrounding ground, manual seeding whereby denuded areas were seeded by hand or were planted with seedlings, the selective cutting method whereby selected trees only were logged and specifically chosen for logging according to the end desired. This end might be perpetuation of the forest as originally comprised, or the creation of a forest of more valuable trees. These methods were

not mutually exclusive and in some types of forests combinations of these methods were used.

The term "selective" or "selection" cutting as it has been used in this case refers to the method whereby trees are specifically selected to be cut with the object of leaving the forest in such a condition that a continuous or sustained yield of timber will result naturally. While the selection of the trees to be cut may be governed to some extent by the demands of the current market, the meeting of such market demands does not relieve the forest manager from selecting trees to be cut with due consideration for the peculiarities of the various species, for maintaining a sufficient crown cover or canopy to prevent drying out of the forest floor, and from leaving enough specimens of valuable species to insure their reproduction. In a large uneven-aged forest such as the Menominee, where the stands are generally dense, the practice of selective cutting enables quick logging over large areas, thus removing the overmature trees before they become decadent. This system also permits periodic cuttings from the same area of an amount equivalent to the growth during the period when the cutting is done. The remaining stand is never denuded by such cutting and reproduction will generally start and be sustained in the small, protected areas so cut. This type of cutting permits the removal of trees that impede the growth of other trees and fairly old trees have been known to increase rapidly in size as a result of such release. It is also possible, by the use of this method, to bring about an improvement of the species in an area by leaving a greater proportion of the more valuable species as seed trees.

The term "clear cutting" has been used in this case to denote a system of silviculture and also to describe a method of liquidating all the merchantable timber in a forest. As a silvicultural system, clear cutting is usually the strip method, referred to above, where cutting is restricted to lanes narrow enough to be seeded and protected from the sides. This system is well adapted to even-aged stands composed of trees that thrive best in complete sunlight since the cutting of all the timber in narrow strips or patches will usually permit good reproduction in such openings from the adjacent timber left standing. The size of such strips or openings must be limited if reproduction of desirable species is to be accomplished. This system of silviculture was not suitable for an uneven-aged stand such as the Menominee consisting of mixed hemlock-hardwood forests thriving best in the shade of other trees. The seedlings from such tolerant species would have little chance of survival in the open strip, and the sub-merchantable sizes left in the strip would have difficulty in surviving the sudden shock of complete exposure to sunlight and wind even if they had not been damaged in the cutting operation.

The evidence in this case convinces us that clear cutting as a silvicultural system was not practiced on the areas in suit. The type of so-called clear cutting practiced by defendant on the Menominee involved the cutting, over large unrestricted areas, of all the merchantable timber in entire disregard of forest welfare, forest conditions, and the continuation or perpetuation of the forest. Large areas, rather than narrow strips, were almost completely denuded of all but a scattering of submerchantable trees usually of a species that required shade and moisture to survive, and of occasional overmature trees which were particularly subject to blow-down from high wind. Throughout the remainder of this opinion and in our findings No. 33 through 96, we have used the expression clear-cut in the sense that the defendant cut the areas in question—not in the sense of clear cutting as a silvicultural system.

We have found that a selectively cut area does not constitute much more of a fire hazard than would a virgin stand since the crown cover keeps the ground moist and the accumulation of slash is not as great and will not become as dry. After clear cutting of the type practiced by defendant, the resulting open area, populated only with immature trees and seedlings, is a dangerous fire hazard because the ground will dry out through lack of shade and unless

the slash is carefully disposed of, it too will constitute a fire hazard. A fire starting in such a clear-cut area will sweep over the area and kill or badly damage all reproduction. With respect to wind hazard, a selectively cut area has somewhat more protection against blow-down than a thick virgin stand because the occasional openings in the edge of the stand and throughout will permit the wind to enter the stand and dissipate, whereas a virgin stand presents a solid front to the wind and may well blow down with the impact. The small trees in a clear-cut area have no protection against a wind storm.

The defendant urges that conditions on the Menominee forest were peculiarly suitable to the application of the clear cutting system of silviculture. If defendant refers to the type of clear cutting which we have found it practiced on this forest both prior to and after the passage of the Act of 1908, it is interesting to note that defendant also states in connection with other areas logged prior to 1908 and from which all the merchantable timber had been removed in such a clear-cut manner, that "only the lapse of time and the absence of fire, or other destructive forces of nature, were required for the production of valuable commercial timber." Defendant urges that the Act of March 28, 1908, did not require the application of any particular cutting system in the logging operations on the Menominee reservation; that clear cutting and cutting to diameter limits was not prohibited by that act; that the selective system of logging in hemlock-hardwood forests such as the Menominee was purely experimental during the years in suit and was considered by the best authorities in forestry to be impracticable, and that the phrase "fully matured and ripened green timber" was properly interpreted by the Department of the Interior as referring to timber which, by its age and size, had reached commercial maturity.

It is true that the 1908 Act does not use the expressions "clear cutting", "selective cutting", "physiological" or "commercial." However, we think it is quite clear, as pointed out above, that the act had as one of its purposes, equal in importance to the others, the preservation of the Menominee forest in such a way that it would provide a continuing source of income to the Indians who could not, if its resources were depleted, move on to another forest. While the act did not specify the exact silvicultural method to be employed to accomplish this end, we must assume that Congress intended the Department of Agriculture and the Department of the Interior to devise some system which would bring about the desired result.

We have found that the system of clear cutting practiced by defendant on the areas in question could not and did not preserve the forest and we cannot agree that it was in any way justified because in so cutting defendant took all of the commercially mature timber from the areas. We do not believe that the 1908 Act referred to commercial maturity when it used the expression "fully matured and ripened green timber". The concept of commercial maturity as it is represented in the type of logging carried on by defendant has no relation to forest preservation nor, indeed, to the idea of maintaining a steady income from a piece of property which constitutes the owner's sole asset— an asset which cannot be replaced by acquiring another when it is exhausted of its income-producing product. If Congress intended the word "matured" to mean commercial or market maturity, and had meant to approve or direct the cutting of all merchantable timber from areas of unrestricted size on the reservation, the use of the expression "preservation of the forest" becomes meaningless since we have found that the use of such a system of cutting would not, in a forest such as the Menominee, accomplish this end. The expression "fully matured and ripened timber" was, we believe from the legislative history of the 1908 Act, intended to indicate physiological maturity and the expression was so understood by the Forest Service of the Department of Agriculture which had much to do with the drafting of that act, and by trained foresters generally at that time.

Thus, although the 1908 Act did not in so many words prohibit clear cutting, it did, by plain implication, prohibit the practice of any system of cutting that would be destructive of the forest and prevent that forest from being a continuing income-producing asset to the Indians. Again, the act did not command in so many words the use of the selective cutting system—yet, having in mind the preservation purposes of the Act, the fact that maturity used in connection with the preservation of such a forest as the Menominee could only mean physiological maturity, the direction to cut only such matured and ripened green timber as the forestry service shall designate—we can only conclude that the language and legislative history of the act point irresistibly to something like the system of selective cutting in the management of the forest. In an uneven aged forest such as the Menominee, where trees of all ages stood side by side, a selective method of cutting was required to remove only the fully matured and ripened green timber as required by the 1908 Act.

The record in this case further persuades us that the selective cutting system of silviculture, admittedly well known and practiced in Europe for many years prior to 1908, was known to most trained foresters in the United States in 1908, was taught in American schools of forestry throughout the period in suit, and was practiced by the Government on national forests and by various private owners. It is true that this system met with little popularity in the lumber industry until late in the 1920's when it became apparent even to the members of that industry that the supply of timber in this country was far from inexhaustible and that some sort of intelligent management was necessary to secure a sustained yield from the remaining forests.

Whether selective cutting would have preserved the forest on the areas in suit we do not know, but from the evidence presented it seems to us that even in 1908 it might reasonably have been expected to do just that. Clear cutting, as practiced on the Menominee forest, whatever its merits as a system of silviculture may be when applied to other types of forests, did not and could not, even in 1908, reasonably have been expected to preserve the forest on most of the area claimed.

The Government also argues that the so-called 1912 rules described above were in conformity with the provisions of the 1908 Act and were used during the period from 1910 to 1919. If we assume that individual marking of trees was not required (a matter which we discuss later in this opinion), still the 1912 rules called for the cutting of timber that was physiologically immature in all species since the rules were framed wholly within the concept of market or commercial maturity both by the repeated use of the word "merchantable" and by specifying diameter limits which of necessity called for the cutting of physiologically immature trees. We conclude that these rules were not in conformity with the provisions of the 1908 Act and we have found that in any event, they were not applied with any degree of consistency from 1910 to 1919 in the areas in suit.

The defendant next urges that the special jurisdictional act should not be construed as a legislative interpretation of the requirements of the 1908 Act. Whether the jurisdictional act is to be construed as creating a new obligation or merely conferring jurisdiction on this court to decide the case on the merits, is immaterial, since we think that the specific acts mentioned in the 1935 Act as constituting a violation of the 1908 Act, or as being a ground for recovery under the 1935 Act, were acts which, if committed, would have been a violation of the 1908 Act, and that we would have so found had the 1935 Act merely provided that liability arises on a violation of the 1908 Act without more. Thus, if we could find that a system of designation was formulated and used which was reasonably calculated to preserve the Menominee forest, and that, except for accidents, or acts of nature that could not have been foreseen or taken into account in the plan, the forest had in fact been preserved, we would conclude that the

Government is not liable under the 1908 Act or the 1935 Act as written.

■ The Government next argues that the 1908 Act is not mandatory on the question of designation, but rather directory because of the use of the word "shall" in connection with "designate," citing Cairo and Fulton Railroad Company v. Hecht, 95 U.S. 168, 24 L.Ed. 423, and Triangle Candy Company v. United States, 9 Cir., 1944, 144 F.2d 195, at page 198, 155 A.L.R. 903 in which latter case the court said: "However, in cases involving prospective action of government officials, the word "shall" may be given a merely directory meaning if the law's purpose is rather the protection of the government by guidance of its officials than the granting of rights to the private citizens affected."

Defendant also quotes from Sutherland, Statutory Construction, Vol. 3, 3d ed. (1943), sec. 5808 (pp. 88–89): "Provisions which, although directing action or regulating conduct of public officers, have for their purpose merely the securing of order and dispatch in the conduct of the business of such office, and on which the rights of individuals or the public cannot be said to depend, are directory only."

Apparently the defendant construes this provision in the 1908 Act as having for its purposes the protection of the government and the securing merely of order and dispatch in the conduct of the business of a government office—a provision whose disregard by the government could not injuriously affect the rights of the parties. We cannot so construe the 1908 Act in any of its provisions. That act was clearly passed for the protection of the Indians in order to secure for them a steady income from their property to be brought about by proper management on the part of the Government. Preservation of the forest was one of the purposes of the act. The proper designation of the timber to be cut was one of the ways specified for effectuating that purpose. Failure to do so in some manner that would accomplish this purpose was a failure to carry out an order designed for the protection of the Indians for whose benefit the Act was passed, and was a violation of what we can only consider to be a mandatory provision in the Act.

■ The Government contends that the 1908 Act does not specifically or impliedly require the *marking* of individual trees and in support of this contention refers us to the act of March 3, 1911, 36 Stat. 1076, relating to the cutting of dead and down timber in the 1910 fire area and permitting in addition the logging of "such green timber as may be necessary to cut in order to economically log the dead and down timber." With respect to the green timber, the act reads "such green timber to be designated and *marked* by the Forestry Service." (Italics supplied.) From this defendant concludes that Congress was using the words "mark" and "designate" in entirely different senses; that "mark" can only mean the marking of individual trees, and therefore the word "designate" must mean something else. Defendant further points out that the word "designate" is used in the 1911 Act in connection with the right of the Forestry Service to "designate" additional dead and down timber which it might deem necessary to cut, and argues that dead and down timber certainly did not have to be individually *marked*. At first blush there seems to be merit to defendant's argument. Certainly the 1908 Act does not say that each individual live tree to be cut must be marked with a government stamp, whereas the 1911 Act does say so substantially. And it may be that a designation system other than individual marking of trees might have constituted substantial compliance with the 1908 Act. However, we believe that whatever system of designation was devised and used had to be one that was reasonably calculated to preserve the Menominee forest. It is altogether conceivable that a system of individual marking might have been used which would *not* have accomplished this end. It is perfectly clear, however, from the evidence in this case, that the system of designation both as formulated and particularly as carried out during the period in suit, did not and could not reasonably have been expected to preserve the forest. Accordingly, the fact that the act did not

specifically require marking of individual trees, does not relieve the defendant of its *duty to preserve the forest* nor relieve it of liability for its failure to so preserve it. In this connection, it should be noted that Congress, in the jurisdictional act provided in Section 6 (c) that this court shall award damages if it be determined that defendant has violated the terms and provisions of the 1908 Act by cutting other than fully matured and ripened timber as the Forestry Service shall have *properly* designated.

Next, defendant contends that assuming the 1908 Act to be mandatory with respect to the necessity for designations from the Department of Agriculture, the Acts of 1917 and 1918 [3] relieved the Agriculture Department of this duty and placed upon the Forest Service of the Indian Bureau the duty of determining what timber should be cut. These acts had to do with permitting agriculture on certain cutover lands where there was merchantable timber, and provided that the Indian Bureau should survey such lands which were to be cleared of merchantable timber for farming purposes and required the Forest Service of the Indian Bureau to certify that lands proposed to be so cleared *were not necessary to the preservation of the forest* and that it would not be detrimental to the forest that the merchantable timber be removed. The 1908 act limitation on the number of board feet that could be cut annually was not changed by these acts and defendant concludes that the Indian Bureau Forest Service could have certified that up to that limit of merchantable timber should be cut from the forest under such acts on land to be used for agricultural purposes, and that therefore it would be unreasonable to assume that the Department of Agriculture Forest Service still had to designate the timber to be cut. We see nothing in these acts repealing the 1908 Act requirement that the Department of Agriculture Forest Service must designate the timber to be cut in order to preserve the Menominee forest. The Acts of 1917 and 1918 merely provided that before any

forest area containing merchantable timber could be converted to agricultural use, the Interior Department Forest Service must certify that the lands so intended to be used were not necessary to the preservation of the forest and that if *all* the merchantable timber was to be removed, the forest as a continuing asset would not suffer. In all events, the requirement that the forest be preserved and that designations (whether by marking or some other method calculated to preserve the forest) to accomplish that end be made by the Department of Agriculture was not changed by the 1917–1918 Acts. It is abundantly clear that, whoever did the designation and managed the forest, the duty to preserve it continued, and the real question is therefore, was the forest preserved from 1919 to 1928 when the Department of Agriculture was out of the picture and Interior was managing the forest exclusively?

In this connection the government contends that the logging from 1919 to 1928 under the supervision of the Indian Bureau was substantially in accord with the 1912 rules of the Department of Agriculture Forest Service and therefore such logging did not constitute a violation of the 1908 Act. Defendant says that there is no reason to suppose that had Agriculture been asked to designate, it would have done any differently than Interior did from 1919 to 1928. This whole line of argument assumes that what Agriculture did in the way of designation on the areas claimed from 1910 through 1918, and the 1912 rules, were in compliance with the 1908 Act. First we have found that the designations made by the Department of Agriculture in 1911–1912 were not in compliance with the 1908 Act and that the 1912 rules would not, even if followed, have preserved this particular forest. Secondly, we have found that these rules were not actually complied with during the entire period in question.

Defendant further says that the system of logging it was carrying on from 1919 to 1928 was in high favor in the Forest Service of the Department of Agriculture. If the Department of Agriculture Forest

3. Act of March 2, 1917, 39 Stat. 991; Act of May 25, 1918, 40 Stat. 561.

Service was in fact recommending the system of cutting which defendant says it was recommending up to 1928 (and the record casts much doubt on that contention), then it was a system which could not be reasonably expected to, and in fact did not, preserve the Menominee forest in the areas involved in this suit, and the fact that Interior followed such a system does not relieve the defendant of liability for failing to preserve the forest. Methods of silviculture which would have preserved this forest were well known, were practiced on national forests and to a less extent in privately owned forests; such methods had been long practiced in Europe and were well known to foresters in and out of the Government service.

The mere presence of some reproduction on the areas in suit is not enough to relieve the Government from liability, since it is clear from the evidence that such reproduction will not develop into a forest fit for profitable cutting for more than 100 years and not then unless nature is kinder than it is ever known to have been. This is not the kind of preservation which Congress had in mind in passing the act. If it had been, then there was no necessity for passing such an act, for all the act did, if we accept the defendant's interpretation, was to permit the continuance of the methods of logging already in use when the act was passed.

The Government next argues that the logging operations which it conducted on the reservation did not prevent the preservation of the forest and that the word "perpetuate" (used in the jurisdictional act) should not be read into the 1908 Act in the sense that Congress contemplated the maintenance of existing forest conditions. The defendant's arguments in this connection are mostly a restatement of its previous contentions with respect to commercial maturity, the splendid results that can be obtained in the way of reproduction from the use of the clear cutting or diameter limit systems, the uneconomic aspects of the selective cutting system and the fact that in time (a long time) much of the forest will come back. We believe that most of

these matters have already been discussed and disposed of herein. Certainly we believe that the words "preserve" as used in the 1908 Act and "perpetuate" as used in the jurisdictional act, are not mutually exclusive and that both were used with the over-all thought in mind that a continuing steady income should accrue to the Indians who, in all probability, will have to remain on the reservation indefinitely. This, we think, is what Congress had in mind in using the expression "sustained yield" in the jurisdictional act. The fact that the remaining forest might possibly yield the annual limit of 20 million feet of timber for many years does not, we think, justify the Government's cutting the areas in suit in such a manner that those particular cut-over areas will yield little or no income for more than a hundred years and then only if fires, wind and drought and the tendency of low value species such as aspen and fire cherry to thrive in them, are all suspended during that time. We do agree with defendant that Congress probably did not contemplate the maintenance of conditions in the Menominee forest as they existed in 1908. From the legislative history referred to previously above, we believe that Congress hoped for a great improvement in the forest conditions on the reservation.

In our discussion of the defendant's duty under the 1908 Act to preserve the Menominee forest, we do not mean to imply the act constituted the defendant an insurer of the perpetuation of the forest. We believe and we think Congress had in mind, that if only the fully matured and ripened green timber which was properly (with regard to forest preservation) designated was cut, the normal effect would have been the self-perpetuation of the forest, subject of course, to the usual risks imposed by nature.

Next the defendant says that in the logging operations conducted on the reservation from 1910 to 1928, the Government exercised the good faith, diligence, care and prudence required of it as a trustee and guardian of the plaintiff. With this we cannot agree. From 1910 to 1922 there was no trained forester on the reservation to

plan the cutting operations. When one was brought to the reservation, he was not allowed to practice forestry or even to investigate the conditions existing in the logging areas. During the entire period in suit there was repeated criticism of the methods being used, both from within and without the Interior Department. The management of the forest was left in the hands of men whose main experience had been in commercial lumbering operations and who had little knowledge of, and no sympathy with, forestry as a science, or conservation as a principle, in the management of forests. Official documents in evidence in this case reveal the fact that responsible persons[4] in the Indian Office were conversant with the 1908 Act and its requirements and were also conversant with the sort of forestry that would have accomplished the purposes of the act both with respect to conservation and with respect to bringing to the Indians a substantial commercial benefit from the scientific management of the forest. Those officials knew that the lumber business of the Menominee Indians could not be conducted along the lines of the usual private commercial enterprise where the owner of a forest can sell or abandon it and move on to another. They also knew that the forest constituted almost the only income-producing asset belonging to those Indians. We cannot believe that these officials, assuming them to be prudent men, would have conducted their own businesses or private affairs in the manner in which they conducted the affairs of the Indians, assuming also, of course, the same conditions or restrictions existed in their circumstances as did in the case of the Indians. We conclude that the United States has not fulfilled the required standards applicable to an ordinary fiduciary in its management of the timber operations on the reservation either as a commercial or industrial enterprise or in the preserving of the In-

dians' only capital—the forest. The exact extent of the actual damage done is a matter not before us at this time.

■ With respect to the South Branch area, Township 30 North, Range 16 East, the defendant contends that 241 acres claimed in Section 1, and 91 acres claimed in Section 12, are not properly the subject matter of this suit because, during the period in question, this land was owned by the State of Wisconsin. It appears that Wisconsin had acquired valid title to the swamplands within the reservation pursuant to the Swamp Land Act of 1850, 9 Stat. 519. United States v. Minnesota, 270 U.S. 181, 46 S.Ct. 298, 70 L.Ed. 539; United States v. Wisconsin, 273 U.S. 769, 47 S.Ct. 20, 71 L.Ed. 883. This matter was settled in 1926, and thereafter the Menominee Tribe sued the United States for breach of treaty in failing to convey to the tribe all the lands within the boundaries of the reservation under the Treaty of 1854, 10 Stat. 1064. In Menominee Tribe v. United States, No. 44294, 95 Ct.Cl. 232, the tribe recovered a judgment for the acquisition price of the swamplands and, pursuant to a Joint Resolution of Congress enacted on May 29, 1944, 58 Stat. 255, the lands in question were purchased from Wisconsin. The Joint Resolution authorized the use of the funds recovered on the judgment for the purchase of the swamplands, and further provided in section 4 that "The United States shall acquire and hold such lands for the sole benefit and use of said Indians *as if they had become a part of the Menominee Reservation pursuant to the treaty of May 12, 1854."* (Italics supplied). Actually, the Indian Office, in the management of the Tribe's affairs, had treated the swamp lands in question as though they were a part of the reservation, cutting the timber therefrom and crediting the proceeds to the account

---

4. Contemporaneous official documents written by Government officials involved in the management of the reservation which are in evidence in this suit are frequently at variance with their oral testimony at the hearing. In most instances this variation was not satisfactorily explained by the witnesses and we have been inclined to give more weight to the plain import of their official writings made at a time when no action against the Government was pending and relating to events occurring at the time of the writings.

of the Indians, and this court, in rendering judgment for the Tribe in case No. 44294 mentioned above, awarded the Tribe an amount to cover the value of timber removed from the swamp lands in 1897–1898 pursuant to the first section of the Joint Resolution of 1944. That judgment did not include compensation for the cutting done during the period involved in this suit. Since, in the Joint Resolution of 1944, Congress directed the defendant to hold the lands in question for the benefit of the Indians as if those lands had become a part of the reservation in 1854, we conclude that plaintiff may properly claim damages for improper cutting on such lands during the period now in suit.

We conclude that the Government has violated the terms and provisions of the Act of 1908 on 20,326 acres as specifically set forth in Findings 33 through 96 for the period from 1910 through 1928 in that there was cut mature green timber not properly designated by the Forest Service of the Department of Agriculture and much immature timber, and that the timber was cut in such a way that the forest has not been preserved or perpetuated and, finally that there is little prospect of the natural replacement of a valuable forest on these areas within the foreseeable future.

Judgment for the amount of compensation to which the plaintiff may be entitled and the determination of the amount of offsets, if any, are reserved for further proceedings under rule 39(a).

It is so ordered.

MADDEN, WHITAKER, and LITTLETON, JJ., and JONES, C. J., concur.