**WEST VIRGINIA DIVISION OF the IZAAK WALTON LEAGUE OF AMERICA, INC., et al,. Plaintiffs,**

v.

**Earl L. BUTZ, Secretary of Agriculture of the United States, et al., Defendants.**

**Civ. A. No. C–73–68–E.**

United States District Court,
N. D. West Virginia.

Nov. 6, 1973.

James C. West, Jr., Jones, Williams, West & Jones, Clarksburg, W. Va., Bruce J. Terris, Helen C. Needham, Washington, D. C., James W. Moorman, Sierra Club Legal Defense Fund, San Francisco, Cal., Toby Sherwood, Natural Resources Defense Council, Inc., Palo Alto, Cal., for plaintiffs.

Mark Wine, 2137 Land and Natural Resources Division, Dept. of Justice, Washington, D. C., James F. Companion, U. S. Atty., Wheeling, W. Va., for defendants.

MAXWELL, Chief Judge.

Three proposals to sell timber from the Monongahela 'National Forest have activated judicial review of the management and harvesting policies and practices of the United States Forest Service. While the timber harvesting practices under attack in this civil 'action are referred to as clearcutting, and variations thereof, the issues before the Court are much broader.

Plaintiffs ground their civil action upon the provisions of the Organic Act of 1897, 16 U.S.C.A. §§ 473–482, 551.[1]

Defendants submit that the management and harvesting policies presently in force on federal land with regard to timber management and harvesting are fully authorized under the Organic Act.

Cross motions for summary judgment, under Federal Rules of Civil Procedure 56, with supporting affidavits, have matured the issues of law in this litigation for immediate consideration by the Court. The parties also entered into a statement of agreed facts as a further basis for the Court to proceed to the issues.

In essence, there is factual agreement between the parties that the plaintiffs, and their membership, have suffered injury from the timber management practices complained of in the Monongahela National Forest and thereby have the requisite standing to be before the Court; that the three proposed timber sales contracts, the basis of plaintiffs' litigation, are under the authority of the

---

1. The crux of plaintiffs' contentions herein, however, are for all practical purposes limited to the provisions of §§ 475 and 476. The pertinent portions of these two sections, insofar as the issues in this litigation are concerned, are as follows:

Section 475:

". . . all public lands that may hereafter be set aside and reserved as national forests . . ., shall be as far as practicable controlled and administered in accordance with the following provisions. No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States; but it is not the purpose or intent of these provisions, . . . to authorize the inclusion therein of lands more valuable for the mineral therein, or for agricultural purposes, than for forest purposes."

Section 476:

"For the purpose of preserving the living and growing timber and promoting the younger growth on national forests, the Secretary of Agriculture, under such rules and regulations as he shall prescribe, may cause to be designated and appraised so much of the dead, matured, or large growth of trees found upon such national forests as may be compatible with the utilization of the forests thereon, and may sell the same for not less than the appraised value in such quantities to each purchaser as he shall prescribe, to be used in the State or Territory in which such timber reservation may be situated, respectively, but not for export therefrom . . . . Such timber, before being sold, shall be marked and designated, and shall be cut and removed under the supervision of some person appointed for that purpose by the Secretary of Agriculture not interested in the purchase or removal of such timber nor in the employment of the purchaser thereof. . . ."

Organic Act and involve the sale and cutting of trees among which trees are, as well as are not, dead, physiologically matured or large; that the three proposed timber sales contracts focused upon in this litigation are in fact representative of other contracts involving the sale of timber in the Monongahela National Forest; that the defendants sell timber under their present management procedures whereby each individual tree is not separately marked for cutting, but the boundaries of the cutting are well marked; and that the proposed timber sales do not require that each tree cut be removed from the forest.[2]

Plaintiffs' allegations of federal question jurisdiction, 28 U.S.C. § 1331(a), and allied sources of relief, 28 U.S.C. § 1361 and 5 U.S.C. §§ 701–706, the Administrative Procedure Act, are not challenged by the defendants.

Plaintiffs seek declaratory judgment and injunctive relief from the Court to assure, not only as to the three specific proposed sales, but also, as to all future timber harvesting contracts and sales, within the Monongahela National Forest, that the Forest Service will (1) allow only the cutting of dead, physiologically matured, or large growth trees; (2) permit only the cutting of trees which have been individually marked; and (3) require the removal of all timber cut.

The plaintiffs are conservation oriented. The West Virginia Division of the Izaak Walton League of America, Inc.; The Sierra Club; The Natural Resources Defense Council, Inc.; The West Virginia Highlands Conservancy; and Forrest Armentrout, an individual resident of West Virginia who utilizes the recreational facilities of the Monongahela National Forest, are the plaintiffs. In addition to the utilization and promotion of the various opportunities available in the Monongahela National Forest by their membership, the four corporate plaintiffs allege a dedication incidental to the maintenance, protection and restoration of natural resources of the United States.

The defendants are Earl L. Butz, who, as Secretary of Agriculture, has statutory responsibility for the national forests under an Act of Congress, 16 U.S.C. § 471; John R. McGuire, Chief of the Forest Service of the Department of Agriculture, who is charged with the supervision of the use of the timber resources of national forests, and possesses authority under 36 C.F.R. 221.6(b) to make timber sales in the national forests; Jay H. Cravens, the Regional Forester for Region 9, the area of the Monongahela National Forest, has the authority and responsibility, Forest Service Manual 2410.4,[3] for preparing timber management plans and the authority and responsibility, Forest Service Manual 2404.13, 2430.3 and 2430.41, to consider and approve timber sales in the region of his assignment. Finally, the Forest

---

2. Pursuant to the request of the Court at the oral argument on August 17, 1973, plaintiffs and defendants submit this statement of agreed facts:

"1. Plaintiffs have alleged sufficient facts to show that they or their members have suffered injury in fact from the timber management practices of the Forest Service on the Monongahela National Forest.

"2. The three contracts which are attached to plaintiffs' complaint and which the Forest Service proposes to enter into under the authority of the Organic Act, 16 U.S.C. § 476, involve the sale and cutting of trees, some of which trees are and some of which trees are not dead, physiologically matured or large. These contracts are representative of other contracts for the sale of timber on the Monogahela National Forest.

"3. In the sale of timber on the Monongahela National Forest, under the authority of the Organic Act, 16 U.S.C. § 476, defendants offer for sale and do sell timber, pursuant to procedures under which each tree is not individually marked prior to cutting, but the boundaries of cutting areas are marked.

"4. In the sale of timber on the Monongahela National Forest, under the authority of the Organic Act, 16 U.S.C. § 476, defendants offer for sale and do sell timber without requiring that each tree cut be removed from the forest."

3. Forest Service, U. S. Dep't of Agriculture, Forest Service Manual 2410.4 (as amended through Amendment No. 77, July 1973) [hereinafter referred to as Forest Service Manual].

Supervisor of the Monongahela National Forest, Alfred H. Troutt, is designated as a defendant because of his authority and responsibility, Forest Service Manual 2404.13, 2430.3 and 2430.42, to consider and approve timber sales in the Monongahela National Forest.

The extent of this litigation is reflected in the fact that the Monongahela National Forest encompasses 820,000 acres in the heart of the Allegheny highlands of West Virginia, of which 784,000 acres are classified as commercial forest land. Plaintiffs urge that the Monongahela National Forest is one of the "finest mixed hardwood forests in the United States."

Additionally, the parties by pleadings estimate that from fiscal year 1968 through fiscal year 1972, approximately 754 MBF (thousand board feet) on 39,922 acres, were harvested under contracts of sale in the Monongahela National Forest. Also, that as of July 1, 1972, the total uncut volume under contract in the Monongahela National Forest was approximately 48,376.06 MBF (thousand board feet) of saw timber and 48,697.98 cords of cordwood covering approximately 14,300 acres.[4]

Plaintiffs allege, but defendants deny, that 46.7% of the total acreage cut between 1968 through fiscal year 1972 was harvested by clearcutting; that 0.04% of the total acreage cut was harvested by shelterwood cutting. As to the uncut volume under contract on July 1, 1972, the plaintiffs allege that 56% of this volume is to be harvested by clearcutting over 30% of the acreage involved; 1% of this volume is to be harvested by shelterwood and seedtree cutting on 1% of the acreage.[5]

The four principal methods of timber and harvest which the plaintiffs allege are being employed in a manner so as to be violative of the mandate of Congress are:

1. Clearcutting is alleged to be the method of designating the outer boundary of an area of trees. The merchantable timber therein is sold without any marking of individual trees to be cut. It is said by plaintiffs that all trees in the group, whether in a patch, strip or stand, are cut at one time regardless of age or condition. The merchantable trees, plaintiffs claim, are removed but many smaller trees are uprooted or cut and left on the ground after logging.

4. "The Monongahela National Forest was established in 1920. . . .

"During the past 50 years (1920–1969), 600,000 MBF of timber have been sold for $9 million. . . .

"Up to 1964, the Forest was managed under an all-age management system (selection cutting). Beginning in 1964 this system was changed to even-age management that, silviculturally, involves clearcutting of some areas for harvest and regeneration objectives, . . . and intermediate cuts in the succeeding stand to control species and growth.

"In 1969, with preparation of multiple-use plans, the administration of the Forest was broadened to include all-age management of forest areas assigned to travel and water zones. Currently, the multiple-use designations by areas are as follows:

| | Acres |
|---|---|
| Water influence | 53,202 |
| Travel influence | 46,593 |
| General forest | 671,815 |
| Special | 48,644 |
| | 820,254" |

Forest Service, U. S. Dep't of Agriculture, Even-Age Management on the Monongahela National Forest, page 2 (1970).

"Annual sales of all timber on the Monongahela reached 35 million board feet by the early 1960's, and since then has increased a third that amount. Short-term contracts of one to three year duration are the general practice."

Forest Service, U. S. Dep't of Agriculture, 50 Year History of the Monongahela National Forest, page 41 (1970).

5. ". . . Selective logging is still being practiced on more acres of land than is clearcutting, about 60% to 40%, and this ratio shall probably continue."

Forest Service, U. S. Dep't of Agriculture, 50 Year History of the Monongahela National Forest, page 42 (1970).

Plaintiffs say that under the clearcutting theory if any trees remain standing they are usually killed by cutting a ring around the trunk of the tree with an axe or by poisoning. Forest Service Manual 2471.2, 2442.6, 2451.23a, 2452.23a, 2453.-23a, 2454.23–1.

2. Seed-tree cutting is said by plaintiffs to be a phase of clearcutting. The outer boundary of a group of trees is designated and then several trees per acre are marked as an indication that they are to remain uncut. All other trees are then logged and cut regardless of their age and condition. Plaintiffs allege that after natural regeneration has occurred then the seed trees are removed. Forest Service Manual, 2471.-22–2, 2442.6.

3. Shelterwood cutting is said by plaintiffs to be a three-phased form of clearcutting. In the first stage, plaintiffs allege that the most mature and defective trees in an area are selectively marked and cut. Many of the trees are never removed, plaintiffs allege. During the second stage seed-tree cutting is practiced. The final stage is when seed trees are removed. Forest Service Manual 2471.22–1, 2471.22–3.

4. Intermediate cutting and improvement cutting are methods whereby a stand of timber is thinned by removing individually marked trees. Plaintiffs allege that under this system a tree marked for removal may be of any age including saplings as well as mature trees. Forest Service Manual 2471.3.

Defendants' position in the litigation is that the Organic Act directs that the national forests be managed scientifically, and leaves the choice of specific management practices to the discretion of the Secretary of Agriculture.[6]

In looking to the actual words of the statute, the defendants contend that the Organic Act expressly provides that the establishment of any national forest is to "improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and *to furnish a continuous supply of timber for the uses and necessities of the citizens of the United States . . . ."* 16 U.S.C. § 475. (Emphasis supplied by defendant.)

Defendants argue that in light of the statutory language of sections 475 and 476,

"When read in context, this language emphasizes utilization of the forests and development of the forest for future growth.

"The plain language of the statute does not require that the law be applied on a tree-by-tree basis, as plaintiffs advocate. Instead the phrase 'dead, matured, or large growth of trees' supports the viewpoint that the language was meant to apply *collectively* to the trees on the forests and not to each tree individually. The same logic should be applied to the 'mark and designate' provision. The statute does not speak of individually marking each tree; a reasonable interpretation would be to apply the statute to groups of trees in the forest as a whole. The same approach can be applied to the 'cut and remove' language—every tree and stick need not be removed."

On April 18 and 20, 1973, the Forest Service advertised three timber sales in the Monongahela National Forest. These offerings trigger this litigation.

The pleadings indicate that the Middle Mountain North Sale was advertised on April 18, 1973. Exhibit C. The sale covers the harvesting of 186 acres of the While Sulphur Ranger District. The proposed timber sale contract including the specific conditions and special provisions are a part of the record as Exhibit

6. Forest Service Manual 2402—OBJECTIVE. The objective of management of timber on the National Forests is to grow and harvest timber crops to the best public advantage in accordance with the purposes for which National Forests were established and within the principles of multiple use as authorized and directed under the Multiple Use—Sustained Yield Act.

D. The standard provisions are in the record as Exhibit E. The Environmental Analysis Report is in the record as Exhibit F. These documents show that 186 acres have been designated as clearcut units from which all merchantable timber 5 inches in diameter measured at breast height will be required to be cut; that none of the trees to be cut will be marked prior to cutting.

Also on April 18, 1973, the Forest Service advertised the Snorting Lick Sale. Exhibit G. This sale covered the harvesting of 446 acres of the Greenbrier Ranger District. The proposed timber sale contract, the standard provisions and the Environmental Analysis Report are a part of the record as Exhibits H, E, and I, respectively. These documents reflect that 126 acres, in seven areas ranging in size from ten to twenty-five acres, have been designated as clearcut units from which all merchantable timber, defined in this contract as red spruce above 9 inches in diameter, measured at breast height, and hardwoods above 5 inches in diameter, measured at breast height, will be required to be cut as a part of the timber sale contract. None of these trees will be marked prior to sale or cutting. Three hundred twenty acres will be subject to selection and improvement harvesting. These trees will be individually marked. The trees marked will include trees as small as 11, 9 and 5 inches in diameter, as measured at breast height.

The third sale was advertised by the Forest Service on April 20, 1973, as the Music Run Sale. Exhibit J. This sale covers the harvesting of 445 acres of the Gauley Ranger District. The proposed timber sale contract, the standard provisions and Environmental Analysis Report are a part of the record of this case as Exhibits K, E, and L, respectively. These documents reflect that 116 acres have been designated as clearcutting units in size from 5 to 20 acres. All merchantable timber, defined in this contract as timber above 11 inches in diameter, measured at breast height, will be required to be cut. None of the trees will be individually marked prior to cutting. Three hundred and twenty-nine acres will be subject to selection cutting and improvement cutting and here the trees will be individually marked. However, the trees as marked will include trees as small as 11 inches in diameter, measured at breast height.

All three of the proposed contracts of sale require that all trees cut be removed. It is the contention of plaintiffs that the prior practices and procedures of the Forest Service indicate that many cut trees will remain at the site and will not be removed.

The Court on May 14, 1973, granted a temporary restraining order and scheduled a hearing within the ten days' life thereof to hear plaintiffs' motion for a preliminary injunction. Thereafter by order entered on May 24, 1973, the Court was formally informed by counsel, that counsel for the parties had conferred and "have agreed that the hearing on the Motion for Preliminary Injunction may be merged with the hearing on the plaintiffs' Complaint for Declaratory and Injunctive Relief and have further agreed that the Temporary Restraining Order heretofore granted shall continue in effect until such time as this Court rules on the merits of said Complaint."

A hearing on the merits was scheduled. However, the cross motions for summary judgment were filed and after the completion of a briefing schedule, counsel presented oral argument.

■ A close review of the language of the Organic Act convinces this Court that at the time of its passage in 1897, Congress affirmatively expressed a serious determination to firmly restrict the invasion of public lands and its timber resources for harvesting purposes.

Congress' apparent distaste and antagonism toward certain exploitative practices [7] which occurred in the lumber

---

7. "West Virginia was rich with the natural resources other parts of the country needed to develop their own industries. In what is now the Monongahela National Forest grew

industry obviously set in motion a series of legislative efforts to avert, at that time, and to prevent in the future, a national catastrophe with regard to publicly owned forests.

■ It is this Court's view that the portion of the language of Section 476 which provides "[F]or the purpose of preserving the living and growing timber and promoting the younger growth on national forests, the Secretary of Agriculture . . . may cause to be designated . . . so much of the dead, matured, or large growth of trees found upon such national forests . . . and may sell the same . . . " constitutes a clear directive from Congress, to the persons charged with the administration of the national forests, that trees can be sold and cut only if they are "dead, matured or large growth" and then may be sold only when the sale serves the purpose of preserving and promoting the younger growth of timber on the national forests.

If we are to apply the principle that statutes are to be interpreted according to the usual and ordinary meaning of the words employed in the writing of the statute, then the word *"dead"* means "deprived of life;—opposed to *alive* and *living"* (Webster's New International Dictionary (2d ed. 1960)); *"mature"* means "Brought by natural process to completeness of growth and development . . . full grown; ripe" (Webster's New International Dictionary (2d ed. 1960)); and *"large"* means "Exceeding most other things of like kind in bulk, capacity, quantity, superficial dimensions, or number of constituent units; of considerable magnitude; big; great . . . " (Webster's New International Dictionary (2d ed. 1960)).

While it is true that Section 475 of the Organic Act states that national forests are created "for the purpose of securing favorable conditions of the water flows and to furnish a continuous supply of timber for the use and necessities of citizens of the United States . . . " this is not the total commitment of Congress. The above referred to provisions of Section 476 having to do with " . . . preserving the living and growing timber and promoting the younger growth on national forests" is equally persuasive and is manifestly limiting in its effect.

■ Accordingly, in order "to furnish a continuous supply of timber" Congress gave the Secretary authority to sell timber in national forests, but not to the extent that the Secretary would have full and total discretion to use any management practices which he deemed reasonable. Rather, Congress, under Section 476, restricted the trees that could be sold to "dead, matured or large growth of trees" explicitly "[f]or the purpose of preserving the living and growing timber and promoting the younger growth on national forests."

■ It seems obvious to the Court that the general purpose section of the Organic Act of 1897, namely Section 475, was never intended, by its general terms, to take precedence over the clear and specific requirements of Section 476. This construction seems valid, especially when the purpose section and the specific requirements section do not appear to be in conflict with each other. Congress demonstrated an obvious belief that the specific restrictions of Section 476 would best carry out the provisions of the purposes section, being Section 475.

some of the greatest stands of hardwood timber to be found in any part of the world, and it was reaped by numerous logging operations. It was there for the taking with few restraints. Exploitation was the order of the day. The consequence was a quarter century or so of severe cropping of the timber resource that saw the slopes of the mountains denuded of these excellent stands of timber, hardwoods as well as valuable spruce. By the turn of the century, most of the good timber wealth had been taken from the mountains, as it had earlier been cleared from the fertile valleys."

Forest Service, U. S. Dep't of Agriculture, 50 Year History of the Monongahela National Forest, page 3 (1970).

Congress, by specifically designating that "dead, matured, or large growth of trees" was the outside limitation of timber harvesting practices, was protecting the forest reservations against exploitation by timbering interests.

■ The Court cannot subscribe to an interpretation of the Organic Act of 1897 to the end that *matured* would mean a condition which makes it desirable to cut the tree. If any or every tree of the national forests can be cut whenever the persons in charge of administering the national forests consider it desirable, then the requirements, indeed the very terms, of the Organic Act are eliminated. It is obvious that no trees of the national forests can. be cut unless the Forest Service believes it is desirable. However, to rely solely upon the subjective interpretation of the Forest Service as to what is *matured* is merely an argument that the Secretary of Agriculture has total discretion to determine which trees he wishes to have cut, notwithstanding what this Court believes to be the clear expression of congressional intent. If Congress intended *matured* to mean merely the desirability of cutting any tree, there was no reason for Congress to specify, in addition, for the cutting of "dead" and "large growth" trees. Congress obviously intended, by allowing "dead" and "large growth" trees to be cut, to be adding trees to those which can be cut because they are mature.

Congress very clearly and plainly imposed a further control upon the administration of the sale of timber from public lands when, by Section 476, the Secretary was required to mark and designate timber authorized for sale and to require the cutting and removal of timber subject to sale for the resulting purpose and objective "to improve and protect the forest."

■ The provisions with regard to marking and designating such timber before the same is sold indicated a further safeguard by Congress to prevent the nation's timber resources from being exploited, either by design or by inadvertence.

■ With regard to that portion of Section 476 which requires the timber, ". . . before being sold, shall be marked and designated, . . ." it appears that Congress intended that marking and designation be considered separate and distinct actions. "Marked" as used in the statute is viewed under the facts here to refer to individual trees, while the statutory word "designated" is viewed as a much broader area of location.

■ In looking to the totality of the legislative language of the Organic Act, the Court is satisfied that it was never the purpose or intent of Congress to use the terms "marked" and "designated" as interchangeable, synonymous words that had no difference in meaning. If Congress had intended them to mean the same thing, Congress would have used the words without employing the conjunctive word between them.

■ To give these words their plain, clear and simple meaning, within the context of the litigation, the Court is of opinion that Congress intended the Secretary of Agriculture to *designate* the general area of public land from which timber was to be sold, such as the northern slopes of X Mountain. And thereupon the Secretary was additionally obligated to *mark*, per forest custom and usage, each individual tree statutorily authorized to be sold.

Congress has been wary and since, while giving careful consideration to many legislative proposals relative to the nation's forests,. many of which have been enacted into law, it has steadfastly avoided, in this Court's judgment, the passage of legislation that would repeal, directly or by implication, the requirements of the Organic Act of 1897 as to the type of trees which may be cut and sold from federally owned lands.[8]

8. As a part of the Organic Act of 1897, Congress provided for the use of "timber and stone found upon national forests, free of charge, by bona fide settlers, miners, resi-

Congress has consistently refused to abdicate its legislative control over the harvesting of timber from the public domain. It has from time to time kept the

dents, and prospectors for minerals, for firewood, fencing, buildings, mining, prospecting, and other domestic purposes, as may be needed by such persons for such purposes; such timber to be used within the State or Territory, respectively, where such national forests may be located."

Also as a part of the Organic Act of 1897, Congress directed the Secretary of Agriculture to make provisions for protection against destruction by fire and depredations upon the public forests and national forests and in this charge Congress legislated that ". . . he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction; and any violation of the provisions of sections 473–482 of this title or such rules and regulations shall be punished . . . ."

A little more than a decade after the passage of the Organic Act of 1897 Congress enacted Section 552 of Title 16 U.S.C., which is as follows:

"Consent of the Congress of the United States is given to each of the several States of the Union to enter into any agreement or compact, not in conflict with any law of the United States, with any other State or States for the purpose of conserving the forests and the water supply of the States entering into such agreement or compact."

By virtue of the so-called McSweeney-McNary Act, and amendments thereto, 16 U.S.C. § 581 et seq., Congress "authorized and directed" the Secretary of Agriculture "to conduct such investigations, experiments, and tests as he may deem necessary . . . in order to determine demonstrate, and promulgate the best methods of reforestation and of growing, managing, and utilizing timber, forage and other forest products, of maintaining favorable conditions of water flow and the prevention of erosion, of protecting timber and other forest growth from fire, insects, disease, or other harmful agencies, of obtaining the fullest and most effective use of forest lands, and to determine and promulgate the economic considerations which should underlie the establishment of sound policies for the management of forest land and the utilization of forest products. . . ."

Another example of congressional interest is typified by the provisions of 16 U.S.C. § 581(f).

"For such experiments and investigations as may be necessary to develop improved methods of management, consistent with the growing of timber and the protection of watersheds, of forest ranges and of other ranges adjacent to the national forests, at forest or range experiment stations, or elsewhere, there is authorized to be appropriated annually . . . ."

The latest statutory expression from Congress is contained in the so-called Multiple Use—Sustained Yield Act, 16 U.S.C. §§ 528–531.

Section 528 in pertinent part provides:

"It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes. The purposes of sections 528–531 of this title are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in section 475 of this title."

The important portion of Section 529 provides that:

"[t]he Secretary of Agriculture is authorized and directed to develop and administer the renewable surface resources of the national forests for multiple use and the sustained yield of the several products and services obtained therefrom. . . ."

Section 531(a) identifies "multiple use":

"The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output."

Section 531(b):

" 'Sustained yield of the several products and services' means the achievement and maintenance in perpetuity of a high level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land."

public forests current to the demands of the nation. It has never retreated, however, from its commitment to the ultimate preservation of the forests by controlling the woodsman's axe, now seen in the form of the remarkable power saw, the awesome tree-log skidders and log loaders of a highly sophisticated logging industry.

From a reflection upon the course of events since 1897—a period of 76 years—it becomes increasingly clear that as new theories in forest management were proclaimed, as new methods of harvesting practices became available from the fertile, inventive mind of man, and as new demands for wood products were pressed upon industry, there developed, in the management of the nation's forests a gradual accommodation to the outside pressures of industrial progress in productivity.

It was an easy step from the development, in major proportions, of outdoor recreational, range, watershed, wildlife and fish uses of the national forests to the determination that a typical sale of an area of trees should be by a boundary designation rather than by individually marking each tree. This afforded a quicker, more efficient, more economical use of owner-management employees. This represented the new fact of industrial management of timber land.

It became more "economically" suitable, in the commercial vein, to market, not only "dead, matured and large growth of trees" but also those smaller, still growing trees that would serve to increase the lumber volume per offered tract of land—or on a per acre basis—thus offering the possibility of attracting larger dollar bids from the more affluent and substantial timber interests. The increased offerings of public timber also very naturally accommodated the hunger for the many acres of annual timber land harvest needed by the industry's massive logging capability.

To leave commercially destitute timber behind, unmoved from its place of having been cut, may be practical in today's world of profit and loss statements, objective business decisions and realistic industrial goals. Such failure to remove, in today's advances upon the science of silviculture, may not be as serious a calamity as earlier thought.

Accordingly, it appears that over a period of years, by what would be almost imperceptible gradations, compromises of expressed legislative goals happened in public forest harvest practices. These, for the purpose of this civil action, ripened into maturity in 1964, with the embrace of clearcutting and its progeny by the Forest Service as an acceptable harvesting practice in the cutting and sale of timber from public lands.

The complained of gravitation from congressional mandate to the policies and practices that now exist are exemplified by the three proposed sales of timber, the subject matter of this litigation. The attempt to lessen legislative control over the sale of timber from public lands by policies and practices of the Forest Service, although understandable and perhaps proper in a business, industrial and even in a scientific sense, cannot be sanctioned under the law as this Court finds the same to exist.

If the reasons for the policies and practices of the Forest Service are valid and represent the appropriate state of the science of silviculture, business, forest management and administration, and are needed tools to properly develop uses of and benefits to and from the forest, then such evidence should be presented to the Congress. After studies and hearing from all of the obviously interested parties, Congress can and will make a reasoned judgment in the matter.

Under the present state of the record before the Court, the policies and practices complained of by the plaintiffs do violence to the legislative language of the Organic Act of 1897.

The words or terms of a statute are to be accorded their plain and ordinary meaning. Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 64 S.Ct.

1215, 88 L.Ed. 1488 (1944), is one of the leading cases to this principle. There Justice Frankfurter, speaking for the Court, stated at 618, 64 S.Ct. at 1221:

After all, legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him.

Other cases which appear to be on point and support this principle are:

Banks v. Chicago Grain Trimmers Ass'n, 390 U.S. 459, 465, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968);

Jones v. Liberty Glass Co., 332 U.S. 524, 531, 68 S.Ct. 229, 92 L.Ed. 142 (1947).

Secondary authority which is also expressive on this question can be found at

50 Am.Jur. Statutes § 238 at pages 227–232 (1944), and 82 C.J.S. Statutes § 316 at page 550 (1953).

The clear and unmistakable language of the Organic Act of 1897 authorizes the sale only of the "dead, matured, or large growth of trees," and requires that "before being sold, shall be marked and designated." It further requires that the timber sold "shall be cut and removed."

Policies and practices of the United States Forest Service to the contrary are an unwarranted intrusion into an exclusive area of congressional province.

Efforts toward regulatory blighting of congressional controls by administrative siege can not be permitted. Public lands means public ownership. The most direct control of public forest resources in a republic rests, once asserted as is the case here, with the Congress and until expressly relinquished, that control is reserved.

If present harvesting policies and practices, by whatever name, are to be approved and subsequently used on national forests, such can only be accomplished by congressional enactment.

The clarity of the statutory language of the Organic Act of 1897, as viewed by this Court, is such that further exploration for legislative intent, earlier administrative interpretation and other supportive evidence of the congressional mission is unnecessary.

There is no need to refer to legislative history where the statutory language is clear.

Gemsco, Inc. v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921 (1945);

Jopek v. New York Cent. R. R., 353 F.2d 778, 782 (3rd Cir. 1965).

In United States v. Missouri Pac. R. R., 278 U.S. 269, 49 S.Ct. 133, 73 L.Ed. 322 (1929), it was said:

" . . . Where doubts exist and construction is permissible, reports of the committees of Congress and statements by those in charge of the measure and other like extraneous matter may be taken into consideration to aid in the ascertainment of the true legislative intent. But where the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed.

\*   \*   \*   \*   \*   \*

But the reasons for and the significant circumstances leading up to the enactment may be noticed in confirmation of the meaning conveyed by the words used.

(Citations omitted).

However, a review of such collateral areas here serves to underpin the Court's conclusion as to the expressed purpose of Congress in the management of harvests from the nation's public timberlands. It would not serve a useful purpose, however, in the Court's judgment, to review here the extensive legis-

lative history and the evolution of administrative practices.

Accordingly, the plaintiffs' motion for summary judgment is granted, and the defendants' motion for summary judgment is denied. An appropriate order will follow.