**WEST VIRGINIA DIVISION OF the IZAAK WALTON LEAGUE OF AMERICA, INC., et al., Appellees,**

v.

**Earl L. BUTZ, Secretary of Agriculture of the United States, et al., Appellants.**

**No. 74–1387.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 4, 1974.

Decided Aug. 21, 1975.

Dirk D. Snel, Atty., U. S. Dept. of Justice (Wallace H. Johnson, Asst. Atty. Gen., James F. Companion, U. S. Atty., Raymond N. Zagone and L. Mark Wine, Attys., U. S. Dept. of Justice on brief), for appellants.

Robert E. Jordan, III, Washington, D.C. (William K. Condrell, Stephen Robbins, Steptoe & Johnson, Washington, D.C., on brief), for National Forest Products Association as amicus curiae.

Luther E. Woods, James R. Bailes, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, W. Va., on brief for Appalachian Hardwood Manufacturers, Inc., and West Virginia Forests, Inc., as amicus curiae.

Bruce J. Terris, Washington, D.C. (Helen Cohn Needham, John D. Leshy, Washington, D. C., James C. West, Jr., Jones, Williams, West & Jones, Charksburg, W. Va., James W. Moorman, San Francisco, Cal., on brief), for appellees.

Before BOREMAN, Senior Circuit Judge, and BUTZNER and FIELD, Circuit Judges.

FIELD, Circuit Judge:

Alleging that the Forest Service was entering into contracts for the sale of timber in the Monongahela National Forest of West Virginia the terms of which violated the Organic Act of .1897 [1] (hereinafter "Organic Act"), the plaintiffs instituted this action seeking both declaratory and injunctive relief. Specifically, the plaintiffs challenged three proposed timber sales which in the aggregate covered the harvesting of 1077 acres. Under the sales contracts 649 acres were designated for selective cutting while the remaining 428 acres were to be harvested by clearcutting in units ranging in size from five to twenty-five acres.[2] While the trees to be har-

---

1. 16 U.S.C. §§ 475–482.
2. Prior to 1964 the harvesting method under contracts of sale in the Monongahela National Forest was primarily selective cutting. Under this method each tree is selected for harvesting on the basis of its position in the stand as well as its maturity and future possibility for growth. The trees so selected for removal are marked by either ax blazes or spotted with paint. Since 1964, however, the Forest Service has employed a variety of cutting methods incident to its timber sales program. In addition to selective cutting the methods employed have been shelterwood cutting, seed-tree cutting and clear cutting. Under the shelterwood system enough trees are left to protect imma-

vested by the selective method would be individually marked, the contracts provided that in the clearcut area all merchantable timber would be cut and none of the trees would be individually marked. The plaintiffs charged that the contracts with respect to the 428 acres violated the sales provision of the Act, 16 U.S.C. § 476, which reads in pertinent part as follows:

"For the purpose of preserving the living and growing timber and promoting the younger growth on national forests, the Secretary of Agriculture, * * * may cause to be designated and appraised so much of the dead, matured or large growth of trees found upon such national forests as may be compatible with the utilization of the forests thereon, and may sell the same * * *. * * * Such timber, before being sold, shall be marked and designated, and shall be cut and removed under the supervision of some person appointed for that purpose by the Secretary of Agriculture * * *."

Both parties moved for summary judgment and filed supporting affidavits and exhibits as well as an agreed statement of facts. The statement of facts conceded that the three contracts in question were representative of other contracts for the sale of timber in the Monongahela National Forest and that they involved the sale and cutting of trees, some of which were neither dead, physiologically matured nor large. It was further stated that the Forest Service was selling timber pursuant to procedures under which each tree was not individually marked prior to cutting, although the boundaries of cutting areas were marked. Upon these admitted facts the district court granted the plaintiffs' motion for summary judgment.[3] In doing so, the court declared that the practice, regulations and contracts of the Forest Service which (1) permit the cutting of trees which are not dead, mature or large growth, (2) permit the cutting of trees which have not been individually marked and (3) allow timber which has been cut to remain at the site violate the provisions of the Organic Act. The court enjoined the Forest Service from contracting for or otherwise allowing the cutting of timber in the Monongahela National Forest in violation of the Organic Act. The order further requires the Forest Service to revise its regulations, recognizing, however, certain specific statutory exceptions.[4]

ture trees against exposed conditions, and in the seed-tree method certain trees are left for the purpose of seeding the surrounding ground. Clearcutting is usually associated with even-aged management of the tree resource and has been utilized for many years in the old European forests as well as some parts of the United States such as the Douglas fir forests of Oregon. In even-aged management the forest is composed of timber stands each of which is made up of specific age classes. While an age class usually represents a range of ages rather than a single year, the age normally denotes the period it took for the stand to become established following either natural destruction or previous clearcutting. It normally involves the cutting of most of the trees in a given area for the purpose of regenerating the area by a new stand of trees. *See* Department of Agriculture, 50 Year History of the Monongahela National Forest, p. 41 (September 1970); Affidavit of Alfred P. Mustian, Assistant Director for Silviculture, Forest Service, United States Department of Agriculture, App. pp. 50 & 51.

3. *West Virginia Div. of Izaak Walton League, Inc. v. Butz,* 367 F.Supp. 422 (N.D. W.Va. 1973).

4. The order of the lower court provides:

"Nothing in this order shall be construed as affecting the authority of the defendants to allow the cutting of trees for the purpose of (1) building highways; roads and trails in accordance with 23 U.S.C. 204, 205; (2) protecting the forest from fire and depredation and from insects and disease in accordance with 16 U.S.C. 551, 594a, 594–1 to 594–5; (3) managing the forests for the uses (such as recreation and wildlife), other than timber harvest, permitted by the Multiple-Use Sustained-Yield Act, 16 U.S.C. 528 *et seq.*; (4) thinning and improving the forests in accordance with 16 U.S.C. 576–576b; and (5) investigating, experimenting, and testing methods of reforestation and of growing and managing forest products in accordance with 16 U.S.C. 581."

The district court concluded that the language of the Organic Act constituted a clear directive from Congress "that trees can be sold and cut only if they are 'dead, matured or large growth' and then may be sold only when the sale serves the purpose of preserving and promoting the younger growth of timber on the national forests". In reaching this conclusion the court applied the dictionary definitions [5] to the statutory terms and held that "dead" means "deprived of life"; "mature" means "brought by natural process to completeness of growth and development"; and "large" means "exceeding most other things of like kind in bulk * * *; of considerable magnitude; big; great * * *." The Forest Service does not, of course, take issue with the district court's definition of the word "dead" as used in the statute, but it does contend that the court erred in its interpretation of the statutory phrase "large growth of trees" and placed an unduly restrictive definition on the word "matured". While we are not unmindful that "[a]n insistence upon judicial regard for the words of a statute does not imply that they are like words in a dictionary, to be read with no ranging of the mind," [6] we agree with the district court's interpretation of the statute and affirm.

■ The Service takes the position that "large growth of trees" signifies a sizeable stand or grouping of trees, and that the district court erroneously converted this phrase into "large growth trees" which in effect requires that each individual tree be identified as "large". We think the district court correctly construed this statutory phrase. The stated purpose of "promoting the younger growth" clearly refers to the characteristics of the individual trees, and in our opinion the use of the phrase "large growth of trees" in the latter part of the same sentence likewise refers to the individual trees, the words "large growth" being used in contradistinction to the prior reference to "younger growth". To accept this contention that "large growth of trees" means a sizeable stand or group of trees would treat the words "dead and mature" as surplusage, and violate the "well known maxim of statutory construction that all words and provisions of statutes are intended to have meaning and are to be given effect, and words of a statute are not to be construed as surplusage". *Wilderness Society v. Morton,* 156 U.S.App.D.C. 121, 479 F.2d 842, 856 (1973), *cert. den.,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973). The interpretation urged by the defendants would lead to the absurd result that while in small areas of the forest the authority of the Secretary would be restricted, he would nevertheless be free to cut any trees he might desire from a sizeable stand or group of trees (defined by the Government as ten acres or more), regardless of whether the individual trees in such group or stand were small or large, young or old, immature or mature. In our opinion such a paradoxical result would be at odds with the purpose of the Organic Act as well as the plain language of the statute.

■ The Service further contends that in treating "mature" trees as only those which are physiologically mature, the court ignored other accepted silvicultural tests of maturity. Here again we agree with the district court that the language of the statute means physiological maturity rather than economic or management maturity. A tree is physiologically mature when because of age and condition its growth begins to taper off or it loses its health and vigor, and while age and size are indicators of physiological maturity, they are not exclusively so. From the economic viewpoint a tree is considered mature when it has the highest marketable value, and management maturity is defined as the state at which a tree or stand best fulfills the purpose for which it was maintained, e. g., pro-

---

**5.** Webster's New International Dictionary, 2d ed. (1960).

**6.** Traynor, J.,—*People v. Knowles,* 35 Cal.2d 175, 183, 217 P.2d 1, 5 (1950).

duces the best supply of specified products.[7] We think unquestionably that in using the word "mature" Congress was referring to physiological maturity. This appears to be the meaning of "mature" in forestry terminology today,[8] and was the accepted meaning of the word at the time the Organic Act was passed by the Congress. In the late part of the nineteenth century the *Report Upon Forestry Investigations,* Department of Agriculture, 1877–1898, H.Doc. Vol. 71, No. 181, 55th Cong., 2d Sess., p. 301 (1899), defined the stages of tree growth as "a juvenile stage, when trees develop in height growth at the expense of diameter growth, an adolescent stage, when height growth decreases and diameter growth accelerates, and a mature stage, when height growth practically ceases and diameter growth, although persisting, declines." Since Congress used the word in its physiological sense at the time of the passage of the Organic Act, we know of no canon of statutory construction which would justify or require that its meaning be changed merely because during the intervening years the timber industry has developed the commercial concept of economic or management maturity. We note that a similar conclusion was reached by the Court of Claims in construing the Act of March 28, 1908, 35 Stat. 51, regulating the cutting of timber on the Menominee Indian Reservation. *Menominee Tribe of Indians v. United States,* 91 F.Supp. 917, 927, 117 Ct.Cl. 442 (1950).

■ Turning to that part of Section 476 which requires that the timber "before being sold, shall be marked and designated", we find the statutory language to be simple and unambiguous. The term "marked" in the context of forestry is well defined and means "selection and indication by a blaze, paint  *  *  *  or marking hammer on the stem of trees to be felled or retained".[9] "Designate", on the other hand, is a much broader term and merely means to "indicate".[10] The two words are not synonymous or interchangeable and in using them conjunctively it is evident that Congress intended that the Forest Service designate the area from which the timber was to be sold and, additionally, placed upon the Service the obligation to mark each individual tree which was authorized to be cut. This plain reading of the statutory language is buttressed by reference to the statement of Gifford Pinchot, the first Chief of the Forest Service, in his 1898 *Surveys of Forest Reserves:*[11]

> "In reserves where timber is sold it will be necessary to indicate unmistakably before the cutting what trees are to be cut and afterwards to ascertain that these trees, and these only, have been taken."

Typical of the instructions with respect to sales of timber in Forest Reserves shortly after passage of the Act were those issued by the Secretary of the Interior on February 27, 1902:[12]

> "If the application [to cut timber] is approved, the head ranger or supervisor (with assistance, if necessary) will mark at once all trees to be cut. This is imperative in all cases involving living timber.

> *  *  *  *  *  *

> The marking of standing timber must be done with the "U.S." stamping

---

7. Affidavit of Alfred P. Mustian, supra, n. 2.

8. The Society of American Foresters defines maturity as "the stage at which a tree or other plant has attained full development, particularly height, and is in full seed production  *  *. Thereafter a decline in vigo(u)r, health and, for woody species, soundness marks the stage of over maturity  *  *  *." Terminology of Forest Science, Technology, Practice and Products, Society of American Foresters, p. 165 (1971).

9. Terminology of Forest Science, Technology, Practice and Products, Society of American Foresters, *supra,* n. 7, pp. 276 & 277. *See* Affidavit of P. Mustian, *supra,* n. 2.

10. Webster's New International Dictionary, 2d ed. (1960).

11. S.Doc. No. 189, 55 Cong., 2d Sess. 49.

12. Compilation of Laws and Regulations and Decisions Thereunder Relating to the Establishment of Federal Forest Reserves, p. 59 (GPO 1903).

hammer, and all trees must be marked near the ground in order that the stumps may afford positive evidence of the marking."

This emphasis placed on such selective marking by those who urged the passage of the Organic Act and were charged with the responsibility of its implementation is entitled to particular weight. *See Zuber v. Allen*, 396 U.S. 168, 192, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).

In *Menominee Tribe of Indians v. United States, supra,* the Government contended that since the statute there before the court (35 Stat. 51) used only the word "designated", it did not specifically or impliedly require the marking of individual trees on the reservation, and in support of this contention referred the court to the Act of March 3, 1911, (36 Stat. 1076) which used the language "such green timber to be designated and marked by the Forestry Service." In considering this contention of the Government, the court stated:

"From this defendant concludes that Congress was using the words 'mark' and 'designate' in entirely different senses; that 'mark' can only mean the marking of individual trees, and therefore the word 'designate' must mean something else. * * * Certainly the 1908 Act does not say that each individual live tree to be cut must be marked with a government stamp, whereas the 1911 Act does say so substantially." 91 F.Supp., *supra,* at 929.

In our opinion the position of the government on this point in the *Menominee* case was eminently sounder than the argument they now advance with respect to the interpretation of the Organic Act.

The Service urges that we follow the decision in *Sierra Club v. Hardin*, 325 F.Supp. 99 (D.C. D.Alas.1971),[13] which involved the largest sale ever conducted by the Forest Service, covering an estimated 1,090,000 acres of timber land. The district court, observing that the "presale marking of individual trees would be so onerous that only isolated sales on small tracts could be made," concluded that since the contract contemplated "continued cooperation" between the Forest Service and the buyer compatible with the overall plan for utilization of the forest, it satisfied the purpose of Section 476. In reaching this cryptic conclusion the district court engaged in no analysis of either the clear statutory language or the legislative history, and in all candor we do not find its interpretation of the Organic Act persuasive.

While we base our decision primarily upon a literal reading of the statute we find convincing support for our conclusion in the background and legislative history of the Organic Act. From its initial settlement and continuing throughout the greater part of the nineteenth century, the nation's forest lands were wastefully exploited. Originally, some seventy per cent of the country's total land surface, or approximately 1¼ billion acres, was covered by forests, but by 1893 it was estimated that only 500 million acres of productive forests remained. Over 600 million acres of former forests had become waste and brush land, the greater portion of which had resulted from a combination of wasteful cutting and the careless use of fire.[14] By the late nineteenth century responsible leaders, both in and out of Government, had become so alarmed that they warned the Congress and the country against the immediate and long range effects on both water flow and timber supply which would inevitably result if the irresponsible and profligate timber practices were permitted to continue.

In 1892 numerous bills were introduced in the Congress which provided for the protection of the forest reserves against exploitation but most of these

13. *Vacated and remanded on other grounds, sub nom., Sierra Club v. Butz,* C.A. 9, No. 71–2514 (March 16, 1973).

14. Report upon Forestry Investigations, Department of Agriculture, 1877–1898, H.Doc. Vol. 71, No. 181, 55th Cong., 2d Sess., pp. 46, 47.

were unreported. One of the bills was introduced by Congressman McRae, Chairman of the House Committee on Public Lands, which became the basis for the Organic Act of 1897. In introducing his bill in the 1893 Session, Congressman McRae stated:

> "The main purpose of this bill * * is to protect the forest growth against destruction and the preservation of forest conditions upon which the water flow is said to depend. It gives the Department the authority to allow the use of such timber as can be spared without injury to the forest when its use is a public necessity.[15]

The initial reported version in 1893 provided that "timber of commercial nature" could be cut when the cutting was consistent with the requirement that the Secretary of the Interior "preserve the forest".[16] In 1894 this wording was deleted by House amendment and replaced by the more restrictive provision that "dead or matured trees" could be removed when necessary to preserve the remaining timber.[17] To quiet the concern of those who were distrustful of the executive's ability to protect the forests, Congressman Coffeen, one of the authors of the amendment, stated:

> "As the bill now stands I think no one can reasonably object to its provisions. It provides, indeed, for sale of dead and nongrowing or matured timber where the elimination of that kind of timber is necessary for the better preservation of the living and growing trees; this all under strict supervision. Having myself prepared this section of the amended bill, I feel that the living timber can not in any manner be endangered under its careful wording and provisions.[18]

The intention to restrict cutting only to trees which were dead or physiologically mature rather than those of commercial value is shown by the fears which were voiced by some members of the House and the assurances given to them by Congressman Hermann, the amendment's sponsor:

> Mr. WELLS: * * * Now, it is a fact well known to every man who understands anything of the theory of lumbering, and who understands the maneuvering of land rings and pineland thieves for the last fifty years, that if you permit them to go onto the public domain with an apparent right of any kind they will assume a vested right in all the timber, and instead of cutting merely the dead timber, they will take that which is most advantageous to themselves, and, suborning the men who are employed by the Department to watch the timber, will steal it all and leave nothing but a naked wilderness.

> Why, gentlemen, you need no better evidence of it than that which was adduced before the Committee on Ways and Means in its investigation relative to the tariff in 1890 [here he quoted from the hearing]:

> [Congressman] MILLS. I want to ask you one question here: In cutting the timber are they careful to cut nothing but the large timber in the pineries, sparing the young timber, or do they just sweep it all out?

> Mr. EDGETT [Lumberman]. The young timber cannot be spared. The better practice has been found, from experience, to be to sweep everything clean * * *.

> *      *      *      *      *      *

> Mr. HERMANN: This amendment, as the gentleman is aware, proposes to accomplish just what the gentleman desires, and that is the preservation of the forests of the United States; and I will say this to him, that he will admit that in all forests where there is mature timber *it is necessary to take the mature timber away from the thick and heavy forest to preserve the bal-*

**15.** 25 Cong.Rec. 2374.

**16.** 25 Cong.Rec. 2371 (1893).

**17.** 27 Cong.Rec. 364 (1894).

**18.** 27 Cong.Rec. 367 (1894).

*ance of the forest.* \* \* \* *And that is all this amendment does.* [emphasis added] [19]

Despite assurances by the sponsors of the bill that it fully protected those interests about which Mr. Wells expressed concern, the bill did not pass at that session, and although introduced each year thereafter, passage was not effected until 1897. The phrase "large growth of trees" appeared for the first time in the final version of the bill as passed, and while we find no recorded debate on the addition of this language, Senator Pettigrew, in offering the amendment stated:

"We propose by this amendment, after this country has been surveyed, that the living trees shall be preserved— that is, under the direction of the Secretary of the Interior—so that *the large trees, the dying trees, the trees that will grow no better in time,* may be sold and removed by the purchaser \* \* \*." [emphasis added] [20]

It is significant that Congressman McRae supported the Pettigrew amendment in the House, stating that in his opinion it would accomplish the primary objectives of his bill.

This legislative history demonstrates that the primary concern of Congress in passing the Organic Act was the preservation of the national forests. While the Act as finally passed rejected the position of the extremists who wished to forbid all cutting in the forests, it specifically limited the authority of the Secretary in his selection of timber which could be sold. He could select the timber to be cut only from those trees which were dead, physiologically mature or large, and then only when such cut-

ting would preserve the young and growing timber which remained. Following the addition of "large growth of trees" to the bill, the sponsors repeatedly made it clear that the Act would permit the sale only of the individual trees which met its specific requirements which, in the words of Senator Pettigrew, were "the large trees, the dying trees and trees that will grow no better in time \* \* \*".

Since the proposed legislation limited the types of trees which could be sold, it logically followed that Congress wanted to insure that only the selected trees would be cut. The original version of the McRae bill had no provision requiring that such trees be either marked or designated.[21] In the face of sharp criticism on this point the Hermann amendment added the requirement that the Secretary of the Interior "shall carefully designate \* \* \* said dead or mature trees".[22] This change was insufficient to quiet the critics who were concerned that the loggers would cut whatever timber they wanted and continue to denude the forests. Finally, the Senate Committee on Public Lands amended the bill to include the requirement of marking as well as designating.[23] This requirement remained in the McRae bill [24] and was included in the Pettigrew amendment which became the present statute.[25] It is clear from the legislative history that Congress considered marking to be a necessary adjunct to the pattern of the selective selling and cutting of individual trees under the Organic Act.

■ The appellants also rely upon the subsequent legislation, together with administrative interpretations and practices of the Forest Service,[26] which they con-

---

19. 27 Cong.Rec. 111, 112 (1894).

20. 30 Cong.Rec. 909 (1897).

21. 25 Cong.Rec. 2371 (1893).

22. 27 Cong.Rec. 264.

23. 27 Cong.Rec. 2779, 2789.

24. 28 Cong.Rec. 6410.

25. 30 Cong.Rec. 900 (1897).

26. Concededly, at least over the past ten years, the Forest Service has entered into contracts for the sale of timber on large tracts of land which entailed harvesting methods at variance with the plain wording of the Organic Act. The Service suggests that this practice is an administrative interpretation of the Act which should be accorded considerable weight. The answer to this contention is found in *Wilderness Society v. Morton,* 156 U.S.App.D.C.

tend support their interpretation of the Organic Act. We find it unnecessary to comment upon any of the legislation [27] with the exception of the Multiple-Use Sustained-Yield Act of 1960 (hereinafter Multiple-Use Act), 16 U.S.C. §§ 528–531. Section 1 of the Multiple Use Act [28] states the Congressional policy:

"It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."

Section 2 [29] then provides:

"The Secretary of Agriculture is authorized and directed to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom."

Appellants take the position that this language is a clear Congressional directive to the Secretary of Agriculture to apply modern principles of forestry management and urge that we should make every effort to avoid a restrictive reading of the 1897 Act which they state would impair the ability of the Forest Service to meet the objectives of the Multiple-Use Act. They further contend that in enacting this legislation Congress was not simply imposing a new set of management principles on the Forest Service, but was ratifying the management practices which the Service had developed over the years.

■ In effect, appellants appear to argue that the Multiple-Use Act has by implication repealed the restrictive provisions of the Organic Act. In our opinion, however, this argument falls short of the mark on several grounds. First of all, it is at odds with the well established rule that repeal of a statute by implication is not favored and, as recently stated by the Court in *Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974):

"In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."

In addition to the foregoing principle, Section 1 of the Multiple-Use Act specifically recognizes the continued viability of the Organic Act in the following language:

"The purposes of this Act are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in the Act of June 4, 1897 (16 U.S.C. § 475)." [30]

121, 479 F.2d 842, 865 (1973), a case not dissimilar from the one at hand, where the court stated:

"But it is our firm belief that a line must be drawn between according administrative interpretations deference and the proposition that administrative agencies are entitled to violate the law if they do it often enough. Not to draw this line is to make a mockery of the judicial function. '[T]he courts are the final authorities on issues of statutory construction * * * and "are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute" * * * "The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia . . .".' "

27. The Legislation relied upon includes: McSweeney-McNary Act of 1928, 16 U.S.C. § 581 *et seq.* This legislation established a research program and did not purport to confer any additional authority upon the Department of Agriculture.

Knutson-Vandenberg Act of 1930, 16 U.S.C. § 576, which was addressed to the rehabilitation of lands that already had been cut over and does not involve timber sales in viable forests.

The Oregon and California Act of 1937, 43 U.S.C. § 1181 *et seq.* This legislation dealt specifically with forest property reacquired from the Oregon and California Railroad and was not a part of the National Forest System.

28. 16 U.S.C. § 528.

29. 16 U.S.C. § 529.

30. This sentence was added by the Committee on Agriculture of the House. *See* H.Rep.No. 1551, Apr. 25, 1960, 1960 U.S.Code Cong. & Admin.News, pp. 2377, 2380.

Appellants' argument in this respect also elides the fact that in and out of Congress there has not been unanimous agreement with respect to the interpretation and application of the Multiple-Use Act. Over a decade after its passage controversy over its meaning and intent, as well as the management practices of the Forest Service, including even-aged management and clearcutting, has continued unabated.[31] This division of opinion on the scope of the Multiple-Use Act, as well as the administrative conduct of the Forest Service, was pointed out in the 1972 Subcommittee Report on Clearcutting: [32]

"It is obvious from the extensive testimony received by the Subcommittee * * * on proposed timber management legislation, that timber production has become a priority activity in Federal forest land management. Some construe this as out of step with the spirit and intent, if not the letter, of both the Multiple Use-Sustained Yield and the National Environmental Policy Act of 1969.

Some of its critics believe the Forest Service has been relatively slow and somewhat unresponsive to the awakening national concern about the impact of timber harvesting on other environmental values. Others believe the Forest Service has generally been way ahead of the Nation in consideration of the multiple values and benefits of the National Forests, as evidenced by its strong support of the Multiple Use-Sustained Yield Act of 1960."

■ The language of the Multiple-Use Act is broad and ambiguous,[33] and from our review of the material at hand we are satisfied that in enacting this legislation Congress did not intent to jettison or repeal the Organic Act of 1897. We are equally satisfied that this Act did not constitute a ratification of the relatively new policy [34] of the Forest Service which applied the principles of even-aged management and clearcutting in all of the national forests.

■ It is apparent that the heart of this controversy is the change in the role of the Forest Service which has taken place over the past thirty years. For nearly half a century following its creation in 1905, the National Forest System provided only a fraction of the national timber supply with almost ninety-five per cent coming from privately owned forests. During this period the Forest Service regarded itself as a custodian and protector of the forests rather than a prime producer, and consistent with this role the Service faithfully carried out the provisions of the Organic Act with respect to selective timber cutting. In 1940, however, with private timber

31. *See generally*:
An Analysis of Forestry Issues in the First Session of the Ninety-Second Congress, Senate Committee on Interior and Insular Affairs, 92d Cong., 2d Sess. 4 (1972).
Clearcutting on Federal Timberlands, Report by the Subcommittee on Public Lands to the Senate Committee on Interior & Insular Affairs, 92d Cong., 2d Sess. 2 (1972).
Hearings on Establishment of a Commission to Investigate Clearcutting on Timber on Public Lands before the Subcommittee on Forests of the House Committee on Agriculture, 92d Cong., 2d Sess. (1972).
Report of Forest Management Practices Commission of the West Virginia Legislature (1970).

32. Clearcutting on Federal Timberlands, p. 5, *supra,* n. 30.

33. Two senators have recognized that the Multiple-Use Act is insufficient to meet the specific problem of timber production in the national forests. In the First Session of the 92nd Congress Senator Hatfield introduced S. 350, "American Forestry Act", and Senator Metcalf introduced S. 1734, "Forest Lands Restoration and Production Act of 1971". Both of these bills addressed the problems of timber production and forest management in considerable detail. Extensive hearings were conducted on this proposed legislation, but neither bill was enacted into law. *See* Hearings before the Sub-Committee on Public Lands of the Committee on Interior and Insular Affairs, 92d Cong., 1st Sess.

34. As we have noted, prior to 1964 the Forest Service harvested timber in the Monongahela National Forest primarily through selective cutting, and clearcutting was not initiated therein until almost four years subsequent to the passage of the Multiple-Use Act. *See* n. 2, *supra.*

reserves badly depleted, World War II created an enormous demand for lumber and this was followed by the post-war building boom. As a result the posture of the Forest Service quickly changed from custodian to a production agency. It was in this new role that the Service initiated the policy of even-aged management in the national forests, first in the West and ultimately in the Eastern forests, including the Monongahela.[35] The appellants urge that this change of policy was in the public interest and that the courts should not permit a literal reading of the 1897 Act to frustrate the modern science of silviculture and forest management presently practiced by the Forest Service to meet the nation's current timber demands. Economic exigencies, however, do not grant the courts a license to rewrite a statute no matter how desirable the purpose or result might be. "If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." *People v. Knowles,* 35 Cal.2d 175, 182, 217 P.2d 1, 5 (1950):

We are not insensitive to the fact that our reading of the Organic Act will have serious and far-reaching consequences, and it may well be that this legislation enacted over seventy-five years ago is an anachronism which no longer serves the public interest. However, the appropriate forum to resolve this complex and controversial issue is not the courts but the Congress. The controlling principle was stated in *United States v. City and County of San Francisco,* 310 U.S. 16, 29–30, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940):

> "Article 4, § 3, Cl. 2 of the Constitution provides that 'The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.' The power over the public land thus entrusted to Congress is without limitations. 'And it is not for the courts to say how that trust shall be administered. That is for Congress'." (footnotes omitted).

The judgment of the district court is affirmed.

*Affirmed.*

---

**35.** An Analysis of Forestry Issues in the First Session of the Ninety-Second Congress, pp. 4, 5 *supra,* n. 30.